# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
May 20, 2009 Session

## REBECCA CORNELIUS v. STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S SERVICES

**Direct Appeal from the Circuit Court for Madison County**
**No. C-08-67     Roy Morgan, Jr., Judge**

_____

**No. W2008-02217-COA-R3-JV - Filed July 6, 2009**
_____

This appeal arises from a dependency and neglect proceeding finding the minor child, B.C., dependent and neglected under Tennessee Code Annotated 37-1-102(b)(12), and specifically on the ground of severe child abuse on the part of the Appellant/Mother. The trial court sustained the petition to adjudicate dependency and neglect filed by the Appellee Department of Children's Services. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. STEVEN STAFFORD, J., delivered the opinion of the court, in which ALAN E. HIGHERS, P.J., W.S., and HOLLY M. KIRBY, J., joined.

Charles L. Holliday, Jackson, Tennessee, for the Appellant, Rebecca Cornelius.

Robert E. Cooper, Jr., Attorney General and Reporter, and Michael E. Moore, Solicitor General, Douglas Earl Dimond, Senior Counsel, Nashville, Tennessee, for Appellee, State of Tennessee, Department of Children's Services.

Lanis L. Karnes, Jackson, Tennessee, Guardian Ad Litem.

## OPINION

On June 16, 2007, Appellant Rebecca Cornelius gave birth to B.C. At the time of his birth, B.C. tested positive for cocaine and methadone and was placed in the neonatal intensive care unit. Ms. Cornelius also tested positive for cocaine and benzodiazepines. The State of Tennessee Department of Children's Services ("DCS," or "Appellee") was notified. While B.C. remained in intensive care, at a June 22, 2007 Family Team Meeting, Ms. Cornelius admitted to using cocaine every two to three weeks, and admitted to the use of illegal street drugs throughout the pregnancy. Ms. Cornelius stated that she was never told that using drugs would put her child's health at risk, and

specifically stated her belief that if she smoked crack cocaine instead of "straight lining" the drug, the unborn infant would not be harmed.  B.C. remained in the Neonatal ICU for forty-six days after his birth.  His attending physicians, Dr. Lisa Piercey and Dr. Scott O. Guthrie, testified that the drug levels in B.C.'s system were the highest levels they had seen in an infant, and that the child exhibited some of the most severe withdrawal symptoms they had seen in their careers.  Attempts to wean B.C. from Methadone prior to discharge were unsuccessful, and he was prescribed Phenobarbital.

After an unsuccessful placement with family friends, the child was placed into foster care. At a second Child and Family Team Meeting on July 31, 2007, consideration was given to placing the child in the care of the maternal grandmother.  At that time, Ms. Cornelius was living with her mother, and the hospital advised that it would be against hospital policy to release B.C. to either the mother or her relatives because he was being discharged with a Phenobarbital prescription, which would need to be correctly administered.

Upon DCS's petition, on August 3, 2007, the Juvenile Court of Madison County entered a protective custody order, placing the child in protective custody, appointing a guardian ad litem, and ordering Ms. Cornelius to pay support for B.C.  An adjudicatory hearing was held on November 27, 2007 and, by order of January 8, 2008, the child was declared dependent and neglected upon the finding that Ms. Cornelius had committed severe child abuse against B.C.[1]  Ms. Cornelius appealed the Juvenile Court's order to the Circuit Court at Madison County.

The Circuit Court heard the appeal on July 16 and 17, 2008.  Following its *de novo* review, on September 18, 2008, the Circuit Court entered an order adjudicating B.C. to be dependent and neglected upon a finding of severe abuse.  Ms. Cornelius appeals and raises five issues for review as stated in her brief:

> I.  Whether the term "child" includes an unborn baby under Title 37 of the Tennessee Code Annotated?
>
> II.  Whether prenatal substance abuse can support a finding of dependency and neglect after the child is born?
>
> III.  Whether prenatal substance abuse can support a finding of severe child abuse?
>
> IV.  Whether the trial court erred in considering evidence beyond August 3, 2007, in making its adjudicatory finding?
>
> V.  Whether the state failed to prove severe child abuse by clear and convincing evidence?

---

[1] Ms. Cornelius was represented by  court-appointed counsel throughout these proceedings and in her appeal to the Circuit Court.

In order to address these issues, we must review the statutory scheme governing proceedings on dependency and neglect as well as the role of the juvenile court and the circuit court in such proceedings. The Legislature has described what constitutes dependency and neglect, the procedures and steps to be taken in making this determination, and the jurisdiction of the juvenile courts, as follows:

> A "dependent and neglected child" is a child:
>
> (A) Who is without a parent, guardian or legal custodian;
> (B) Whose parent, guardian or person with whom the child lives, by reason of cruelty, mental incapacity, immorality or depravity is unfit to properly care for such child;
> (C) Who is under unlawful or improper care, supervision, custody or restraint by any person, corporation, agency, association, institution, society or other organization or who is unlawfully kept out of school;
> (D) Whose parent, guardian or custodian neglects or refuses to provide necessary medical, surgical, institutional or hospital care for such child;
> (E) Who, because of lack of proper supervision, is found in any place the existence of which is in violation of law;
> (F) Who is in such condition of want or suffering or is under such improper guardianship or control as to injure or endanger the morals or health of such child or others;
> (G) Who is suffering from abuse or neglect;
> (H) Who has been in the care and control of an agency or person who is not related to such child by blood or marriage for a continuous period of eighteen (18) months or longer in the absence of a court order, and such person or agency has not initiated judicial proceedings seeking either legal custody or adoption of the child; or
> (I) Who is or has been allowed, encouraged or permitted to engage in prostitution or obscene or pornographic photographing, filming, posing, or similar activity and whose parent, guardian or other custodian neglects or refuses to protect such child from further such activity.

Tenn.Code Ann. § 37-1-102(b)(12).

The General Assembly has vested juvenile courts with "exclusive original jurisdiction" to hear allegations that a child is dependent and neglected as defined above. Tenn.Code Ann. § 37-1-103(a)(1). The statutes governing dependent and neglect proceedings require, in effect, a two step analysis. First, under Tenn.Code Ann. § 37-1-129, the court is to hold a hearing and make findings as to whether a child is dependent and neglected. If the juvenile court finds the child to be dependent and neglected by clear and convincing evidence, then the juvenile court is to proceed

-3-

immediately or at a postponed hearing to make "a proper disposition in the case." Tenn.Code Ann. § 37-1-129(c). Making a "proper disposition" requires the court to make a custody decision "best suited to the protection and physical, mental and moral welfare of the child." Tenn.Code Ann. § 37-1-130(a). The fact that a child is dependent and neglected and the fact that a parent has engaged in severe child abuse must be established by clear and convincing evidence. Tenn.Code Ann. § 37-1-129(c); *Tenn. Dep't of Children's Servs. v. M.S.*, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *10 (Tenn.Ct.App. Mar. 8, 2005) (holding that despite the lack of a statutory requirement that severe child abuse be shown by clear and convincing evidence, due to the consequences of such a finding the clear and convincing standard must be applied). For the evidence to be clear and convincing, it must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn.2002) (citing *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n. 3 (Tenn.1992)). The evidence should produce a firm belief or conviction as to the truth of the allegations sought to be established. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn.Ct.App.2007). In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn.Ct.App.2005) (quoting *In re C.W.W.*, 37 S.W .3d 467, 474 (Tenn.Ct.App.2000)).

In dependency and neglect cases, the General Assembly has directed that any appeal from the juvenile court is to be heard by the circuit court.[2] However, it is not just a finding that a child is dependent and neglected that is appealable to circuit court. "[A]ny custody decision that is made during a dependency and neglect proceeding is a part of the dependency and neglect proceeding and appealable to circuit court." *In re D.Y.H.*, 226 S.W.3d 327, 331 (Tenn. 2007) (citing *Tenn. Dep't of Children's Servs v. Owens*, 129 S.W.3d 50, 55 (Tenn.2004)). The appeal from juvenile court to circuit court in a dependency and neglect case is not the same as this Court's review of trial court decisions, as set out in the Tennessee Rules of Appellate Procedure. That is because, by statute, the circuit court is to "hear the testimony of witnesses and try the case *de novo*." Tenn.Code Ann. § 37-1-159(a).

While the record of the juvenile court proceedings is required to be provided to the circuit court on appeal, Tenn.Code Ann. § 37-1-159(c), the circuit court is not limited to that record. On the contrary, the circuit court in a dependency and neglect proceeding may not rely solely on the record made before the juvenile court, but under Tenn.Code Ann. § 37-1-159(c) must try the case *de novo* by hearing witnesses again and by rendering an independent decision based on the evidence received in the circuit court proceeding. *Tenn. Dep't. of Children's Servs v. T.M.B.K.*, 197 S.W.3d 282, 289 (Tenn.Ct.App.2006). A *de novo* trial is "[a] new trial on the entire case-that is, on both questions of fact and issues of law-conducted as if there had been no trial in the first instance." *Kissick v. Kallaher*, No. W2004-02983-COA-R3-CV, 2006 WL 1350999, at *3 (Tenn.Ct.App. May 18, 2006)

---

[2] "The juvenile court shall be a court of record; ... and any appeal from any final order or judgment in ... [a] dependent and neglect proceeding, filed under this chapter, may be made to the circuit court that shall hear the testimony of witnesses and try the case *de novo*." Tenn.Code Ann. § 37-1-159(a).

(no Tenn. R.App. P. 11 application filed). Consequently, the circuit court is not "reviewing" the juvenile court's decision; instead, it is conducting a new proceeding as though the petition was originally filed in circuit court.

This Court reviews the trial court's findings of fact *de novo* on the record accompanied by a presumption of correctness, "unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d); ***In re M.J.B.***, 140 S.W.3d 643, 654 (Tenn.Ct.App.2004). If some of the trial court's factual findings are based on its determinations of the credibility of the witnesses, then this Court will afford great weight to those credibility determinations, and will not reverse such determinations absent clear evidence to the contrary. ***See McCaleb v. Saturn Corp.***, 910 S.W.2d 412, 415 (Tenn.1995).

Whether the ultimate issues of dependency and neglect or severe child abuse have been established by clear and convincing evidence are questions of law, which we review *de novo* with no presumption of correctness. ***See In re the Adoption of A.M.H.***, 215 S.W.3d 793, 810 (Tenn.2007) (holding in a termination of parental rights case that "[a]s a question of law, the trial court's ruling that the facts of this case sufficiently support the termination ground of willful abandonment are reviewed de novo with no presumption of correctness."); ***see also In re Valentine***, 79 S.W.3d 539, 548 (Tenn. 2002) (holding that the question of substantial noncompliance with the requirements of a permanency plan was a question of law reviewed *de novo* with no presumption of correctness). To the extent the trial court made findings of fact in support of the ultimate issues, we review the factual findings pursuant to Tenn. R.App. P. 13(d), *de novo* with a presumption of correctness unless the evidence preponderates otherwise. ***In re A.T.P.***, No. M2006-02697-COA-R3-JV, 2008 WL 115538, at * 4 (Tenn.Ct .App. Jan. 10, 2008) (holding that findings of fact in a dependency and neglect action for severe child abuse are "presumed to be correct unless the evidence preponderates against them"); ***see also In re the Adoption of A.M.H.,*** 215 S.W.3d at 808-09.  However, the trial court's conclusions of law concerning the ultimate issues are reviewed *de novo* without a presumption of correctness. ***S. Constructors, Inc. v. Loudon County Bd. of Educ.***, 58 S.W.3d 706, 710 (Tenn.2001). Therefore, this Court will review the trial court's specific findings of fact in support of its ultimate conclusions *de novo*, pursuant to Tenn. R.App. P. 13(d), with a presumption of correctness; however, we will review those conclusions of law, i.e., that the parents engaged in severe child abuse and that the children are dependent and neglected, *de novo* with no presumption of correctness.

In this case, the trial court found that Ms. Cornelius had severely abused B.C.  The Legislature has defined severe child abuse as:

> "Severe child abuse" means:
> (A) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause great bodily harm or death and the knowing use of force on a child that is likely to cause great bodily harm or death;

(B) Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or retardation, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct;

(C) The commission of any act towards the child prohibited by §§ 39-13-502--39-13-504, 39-13-522, 39-15-302, and 39-17-1005 or the knowing failure to protect the child from the commission of any such act towards the child; or

(D) Knowingly allowing a child to be present within a structure where the act of creating methamphetamine, as that substance is identified in § 39-17-408(d)(2), is occurring;

Tenn. Code Ann. §37-1-102(b)(21).

Turning to the record, Adrian Shields, DCS Investigator, testified that, at her interview, Ms. Cornelius admitted to knowingly and willingly using cocaine every two to three weeks throughout her pregnancy. Ms. Cornelius also admitted to using methadone and Xanax during her pregnancy with B.C. In fact, Ms. Cornelius informed Ms. Shields that her drug cravings actually increased during the pregnancy. From the testimony, it appears that Ms. Cornelius' has had a long history of drug abuse. Vonda Borden, a licensed professional counselor with Jackson Professional Associates ("JPA") testified that Ms. Cornelius started methadone treatment at JPA in November 2006 and continued with that treatment until June 2007. Ms. Borden testified from her records that Ms. Cornelius had at least a ten year history of addiction, including pain killers, cocaine, and intravenous drugs. In fact, Ms. Cornelius failed twenty-five out of twenty-nine drug screens while in treatment. Ms. Borden testified that, on numerous occasions, she had informed Ms. Cornelius of the risk posed to her unborn baby by continued drug use.

Laura Shackelford, DCS Family Services Worker, testified that Ms. Cornelius and her attorney participated in the drafting of the initial permanency plan in this case, and that the goal established was reunification. To that end, Ms. Shackelford testified that she made referrals for parenting classes, alcohol and drug assessment, and random drug screens. The record indicates that, while B.C. remained in foster care, Ms. Cornelius tested positive on several drug tests. Specifically, Ms. Cornelius tested positive for cocaine on hair follicle drug screens dated October 31, 2007 and June 10, 2008. On March 18, 2008, Ms. Cornelius' drug screen indicated positive for methamphetamine. Ms. Cornelius was also positive for cocaine on urine drug screens dated December 20, 2007 and January 25, 2008. She was positive for opiates on November 27, 2007 and December 20, 2007. A new permanency plan was developed on February 20, 2008, with the goal remaining reunification. Ms. Shackelford testified that Ms. Cornelius did not comply with this plan. Specifically, Ms. Cornelius missed visits with B.C. and refused to take drug screens on several

occasions. Moreover, Ms. Cornelius has failed to provide documentation of AA attendance though DCS has requested same.

As noted above, B.C. was born addicted to cocaine. It is apparent from Dr. Scott Guthrie's testimony that Ms. Cornelius' drug use during the pregnancy caused this child severe pain during his withdrawal. Dr. Guthrie testified that B.C.'s symptoms included high-pitched crying, problems with feeding, loss of sleep, hyperactive reflexes, increased muscle tone, elevated temperature, nasal stuffiness, sneezing, nasal flaring, increased respiratory rate, increased sucking, regurgitation and loose stools. Dr. Guthrie testified that B.C.'s case was one of the more severe he had seen. According to Dr. Guthrie, B.C.'s neonatal abstinence scores were some of the highest scores he has ever seen, and these scores indicate that B.C. was "fairly dependent and getting a fairly high consistent dose of medication when he was inside the mother." Dr. Guthrie testified that he is concerned about long-term neurodevelopmental problems with B.C., but that B.C. is not yet old enough to fully evaluate in this regard. The testimonies of other medical personnel who had contact with B.C. confirm Dr. Guthrie's testimony that B.C.'s suffering was more pronounced than in most cases. Dr. Lisa Piercey, an expert in pediatrics and child abuse, also testified that B.C.'s case was one of the most severe she had seen. Dr. Piercey testified that she can, within a reasonable degree of medical certainty, associate Ms. Cornelius' drug use with B.C.'s condition at birth. Her assessment was severe physical abuse secondary to drug exposure and drug endangered infant. She used the term "severe" meaning that B.C.'s situation was life-threatening.

Ms. Cornelius also testified in this case. Ms. Cornelius does not dispute any of the testimony regarding her drug history and use. She does not dispute the fact that B.C. was born addicted to drugs that she ingested during his gestation. At the time of her testimony, Ms. Cornelius was not employed, but could provide no evidence as to why she was unable to hold a job.

Officer Alan Randolph of the Jackson, Tennessee police department testified that, on or about June 2, 2008, he responded to a shoplifting case at Lowe's in Jackson. The alleged shoplifter was Ms. Cornelius. Officer Randolph testified that Ms. Cornelius was very forthcoming and voluntarily admitted that she had stolen $700 in tools from Lowe's on that date. She advised that she had been dropped off at Lowe's by two men (whom she refused to name) for the purpose and intent of shoplifting. According to Officer Randolph, Ms. Cornelius readily admitted that this was not an isolated event but that she "had been all over town" shoplifting. According to his report, Ms. Cornelius informed Officer Randolph that she had a long-term drug habit, that she needed to support it, that her drug of choice was methamphetamine, and that she was out of money. A burned spoon, two hypodermic needles, and two butane lighters were found in Ms. Cornelius' purse. She acknowledged that these items were used in her drug practice. During her testimony, Ms. Cornelius admits to pleading guilty, on July 3, 2008, to theft of property under $500 and to possession of drug paraphernalia. She admits to a history of criminal activity that includes drug convictions, and violation of probation.

In her brief, Ms. Cornelius argues that the trial court erred in considering evidence beyond August 3, 2007 in makings its adjudicatory finding of dependency and neglect. We disagree. Tenn. R. Juv. P. 28 provides, in pertinent part:

> **Rule 28. Adjudicatory Hearing. —(a) Scope of Hearing**. The adjudicatory hearing is the proceeding at which the court determines whether the factual allegations of the petition are true and whether the evidence supports a finding that a child is delinquent, unruly, dependent, neglected or abused, or supports a finding authorizing the termination of parental rights as provided in Rule 39. If any of the above findings are made, the determination of the appropriate disposition is to be made pursuant to a dispositional hearing in accordance with Rules 32 and 33 of these rules or, in termination of parental rights cases, Rule 39.
>
> \*                                   \*                                   \*
>
> (c) **Evidence Admissible**. —In arriving at its adjudicatory decision, the court shall consider only evidence which has been formally admitted. All testimony shall be under oath and may be in narrative form. The Tennessee law of evidence shall apply to all adjudicatory proceedings, as follows: In delinquent and unruly proceedings, no evidence that would be inadmissible in an adult criminal proceeding shall be admitted. In addition, in a delinquent or unruly case, no statement made by a child to the youth services officer or designated intake officer during the preliminary inquiry and evaluation process, or pursuant to informal adjustment under Rule 14, shall be admissible against the child prior to the dispositional hearing. In all other cases, evidence shall be admitted as provided by the Tennessee Rules of Evidence.

Ms. Cornelius contends that this rule limits the court's inquiry, during an adjudicatory hearing, to those facts alleged in the dependency and neglect petition and, necessarily, to those facts that occurred before the petition was filed. The dependency and neglect petition in this case was filed on August 3, 2007, so Ms. Cornelius argues that the trial court should not have admitted evidence that occurred thereafter, i.e., Officer Jackson's testimony concerning the shoplifting and possession charges. We find nothing in Tenn. R. Juv. P. 28 limiting the evidence to allegations made in the petition; it merely requires the court to determine whether those allegations are true. However, even if we assume *arguendo* (which we do not) that the evidence of shoplifting and possession should be ignored, there is ample evidence in this record that Ms. Cornelius used drugs throughout her pregnancy, which resulted in B.C. being born drug-addicted, and having to suffer through severe and life-threatening withdrawal. Moreover, Ms. Cornelius was terminated from the methadone program in June 2007 for noncompliance due to her continued drug use. She had tested positive for

numerous illegal drugs, and there is no indication in the record that she has her drug addiction under control. Tennessee Courts have determined that parents can be held to answer for prenatal conduct that causes severe abuse to later-born child. In *In re M.J.J.*, No. M2004-02759-COA-R3-PT, 2005 WL 873305 (Tenn. Ct. App. Apr. 14, 2005), a pregnant mother gave birth to a child who, like herself, tested positive at birth for methamphetamines and opiates. The child was born with tremors, but otherwise developed normally. Despite the fact that the child developed well, the court notes that "the healthy development of the child in this case does not diminish the severity of the harm to which the child was exposed." *Id*. at *8. This Court affirmed the trial court's finding that, "by taking this illegal controlled substance [of methamphetamines], Mother had exposed M.J.J. to a substantial risk of great bodily injury." *Id*. The court concluded that "the record clearly supports the trial court's finding that Mother's prenatal drug use constituted severe child abuse for purposes of parental rights termination."

In a similar case, *In re C.T.S.*, 156 S.W. 3d 18 (Tenn. Ct. App. 2004), *perm. to app. denied* (Tenn. Nov. 8, 2004), the Mother ingested cocaine during her pregnancy and immediately before C.T.S.'s birth. This Court affirmed the trial court, finding that the Mother's use of illegal drugs while pregnant constituted a wanton disregard for the child's welfare so as to form the basis for termination of her parental rights. *Id*. at 25. Likewise, in *In re S.L.A.*, 223 S.W.3d 295 (Tenn. Ct. App. 2006), *perm. app. denied* (Tenn. Apr. 2, 2007), the Mother admitted to using methamphetamines, morphine, and hydrocodone while pregnant, and the child tested positive for opiates at birth. The Court found that the circumstances of the case "clearly demonstrate a wanton disregard for the child" and affirmed the termination of Mother's parental rights. *Id*. at 300.

The facts of this case are at least as egregious as those supporting these decisions. It is clear in this record that, throughout her pregnancy and beyond, Ms. Cornelius has abused myriad drugs. Despite efforts on the part of DCS to assist her in addressing her drug addiction, she has been unwilling to participate in that process. Moreover, the harm inflicted upon B.C. in this case is, by all testimony, an extremely severe case. This child has suffered horrible withdrawal symptoms, and the full extent of his injuries may not be known until well into his childhood. We have closely examined the evidence in the record and have determined that the evidence does not preponderate against the trial court's specific findings of fact leading to its ultimate conclusions of law. In short, the facts found by the trial court clearly and convincingly support the conclusion that B.C. is dependent and neglected and that Ms. Cornelius engaged in severe child abuse.

For the foregoing reasons, we affirm the order of the trial court. Costs of this appeal are assessed against the Appellant, Rebecca Cornelius, and her surety.

_____
J. STEVEN STAFFORD, J.