IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
October 27, 2009 Session

## IN THE MATTER OF:  B.A.C. (d/o/b 6/16/07), A Child Under Eighteen (18) Years of Age

Direct Appeal from the Juvenile Court for Madison County
No. 47-41, 618     Christy Little, Judge

No. W2009-00910-COA-R3-PT - Filed November 24, 2009

This appeal arises out of a termination of parental rights.  The juvenile court terminated the parental rights of Rebecca Cornelius ("Mother") on April 7, 2009, after finding grounds of severe child abuse and persistence of conditions.[1]  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded**

DAVID R. FARMER, J., delivered the opinion of the court, in which HOLLY M. KIRBY, J. and J. STEVEN STAFFORD, J., joined.

Charles L. Holliday, Jackson, Tennessee, for the Appellant.

Robert E. Cooper, Jr., Attorney General and Reporter, Michael E. Moore, Solicitor General, and Douglas Earl Dimond, Senior Counsel, for the Appellee, State of Tennessee, Department of Children's Services.

Lanis L. Karnes, Guardian Ad Litem.

## OPINION

### I. Background and Procedural History

Mother is a chronic substance abuser who has struggled with an addiction to drugs for over twenty years.  Mother started smoking marijuana at the age of nineteen, using daily for over ten years.  Her drug use expanded to include other drugs such as cocaine and dilaudid at the age of twenty-eight.  Dilaudid became Mother's drug of choice, which she used on a regular basis for at least ten years.  Like many substance abusers, Mother eventually incurred criminal charges as a

---

[1] DCS also petitioned to terminate the parental rights of W.J. and Unknown Father.  The juvenile court granted a default judgment against W.J. and Unknown Father in a separate order entered April 7, 2009.

result of her addiction. She pleaded guilty to charges of possession of a Schedule II controlled substance and possession of drug paraphernalia in 2003. She later attended court-ordered treatment after violating the terms of her probation. Mother's efforts at recovery invariably failed. Mother completed treatment at several highly regarded facilities including Buffalo Valley, Teen Challenge, and the Tony Rice Center. Mother, however, admitted at trial that the longest period during which she remained free from drugs was two-and-a-half years.

Mother failed to remain drug free even after she learned she was pregnant. Mother's extensive prenatal use of cocaine caused B.A.C., her only child, to begin life severely addicted to drugs. The Tennessee Department of Children's Services ("DCS") quickly intervened when it learned of B.A.C.'s condition. The resulting dependency and neglect petition was the subject of this Court's recent decision in *Cornelius v. State, Department of Children's Services*, No. W2008-02217-COA-R3-JV, 2009 WL 1929157 (Tenn. Ct. App. July 6, 2009), *reh'g denied*, No. W2008-02217-COA-R3-JV, 2009 WL 1929157 (Tenn. Ct. App. Aug. 6, 2009), *perm. app. filed.*

The facts as presented in *Cornelius* were as follows:

On June 16, 2007, Appellant Rebecca Cornelius gave birth to [B.A.C.] At the time of his birth, [B.A.C.] tested positive for cocaine and methadone and was placed in the neonatal intensive care unit. Ms. Cornelius also tested positive for cocaine and benzodiazepines. The State of Tennessee Department of Children's Services ("DCS," or "Appellee") was notified. While [B.A.C.] remained in intensive care, at a June 22, 2007 Family Team Meeting, Ms. Cornelius admitted to using cocaine every two to three weeks, and admitted to the use of illegal street drugs throughout the pregnancy. Ms. Cornelius stated that she was never told that using drugs would put her child's health at risk, and specifically stated her belief that if she smoked crack cocaine instead of "straight lining" the drug, the unborn infant would not be harmed. [B.A.C.] remained in the Neonatal ICU for forty-six days after his birth. His attending physicians, Dr. Lisa Piercey and Dr. Scott O. Guthrie, testified that the drug levels in [B.A.C.'s] system were the highest levels they had seen in an infant, and that the child exhibited some of the most severe withdrawal symptoms they had seen in their careers. . . .

. . . .

. . . Adrian Shields, DCS Investigator, testified that, at her interview, Ms. Cornelius admitted to knowingly and willingly using cocaine every two to three weeks throughout her pregnancy. Ms. Cornelius also admitted to using methadone and Xanax during her pregnancy with [B.A.C.] In fact, Ms. Cornelius informed Ms. Shields that her drug cravings actually increased during the pregnancy. From the testimony, it appears that Ms. Cornelius' [sic] has had a long history of drug abuse. Vonda Borden, a licensed professional counselor with Jackson Professional Associates ("JPA") testified that Ms. Cornelius started

methadone treatment at JPA in November 2006 and continued with that treatment until June 2007. Ms. Borden testified from her records that Ms. Cornelius had at least a ten year history of addiction, including pain killers, cocaine, and intravenous drugs. In fact, Ms. Cornelius failed twenty-five out of twenty-nine drug screens while in treatment. Ms. Borden testified that, on numerous occasions, she had informed Ms. Cornelius of the risk posed to her unborn baby by continued drug use.

Laura Shackelford, DCS Family Services Worker, testified that Ms. Cornelius and her attorney participated in the drafting of the initial permanency plan in this case, and that the goal established was reunification. To that end, Ms. Shackelford testified that she made referrals for parenting classes, alcohol and drug assessment, and random drug screens. The record indicates that, while [B.A.C.] remained in foster care, Ms. Cornelius tested positive on several drug tests. Specifically, Ms. Cornelius tested positive for cocaine on hair follicle drug screens dated October 31, 2007 and June 10, 2008. On March 18, 2008, Ms. Cornelius' drug screen indicated positive for methamphetamine. Ms. Cornelius was also positive for cocaine on urine drug screens dated December 20, 2007 and January 25, 2008. She was positive for opiates on November 27, 2007 and December 20, 2007. A new permanency plan was developed on February 20, 2008, with the goal remaining reunification. Ms. Shackelford testified that Ms. Cornelius did not comply with this plan. Specifically, Ms. Cornelius missed visits with [B.A.C.] and refused to take drug screens on several occasions. Moreover, Ms. Cornelius has failed to provide documentation of AA attendance though DCS has requested same.

As noted above, [B.A.C.] was born addicted to cocaine. It is apparent from Dr. Scott Guthrie's testimony that Ms. Cornelius' drug use during the pregnancy caused this child severe pain during his withdrawal. Dr. Guthrie testified that [B.A.C.'s] symptoms included high-pitched crying, problems with feeding, loss of sleep, hyperactive reflexes, increased muscle tone, elevated temperature, nasal stuffiness, sneezing, nasal flaring, increased respiratory rate, increased sucking, regurgitation and loose stools. Dr. Guthrie testified that [B.A.C.'s] case was one of the more severe he had seen. According to Dr. Guthrie, [B.A.C.'s] neonatal abstinence scores were some of the highest scores he has ever seen, and these scores indicate that [B.A.C.] was "fairly dependent and getting a fairly high consistent dose of medication when he was inside the mother." Dr. Guthrie testified that he is concerned about long-term neurodevelopmental problems with [B.A.C.], but that [B.A.C.] is not yet old enough to fully evaluate in this regard. The testimonies of other medical personnel who had contact with [B.A.C.] confirm Dr. Guthrie's testimony that [B.A.C.'s] suffering was more pronounced than in most cases. Dr. Lisa Piercey, an expert in pediatrics and child abuse, also testified that [B.A.C.'s] case was one of the most severe she had seen. Dr. Piercey

testified that she can, within a reasonable degree of medical certainty, associate Ms. Cornelius' drug use with [B.A.C.'s] condition at birth. Her assessment was severe physical abuse secondary to drug exposure and drug endangered infant. She used the term "severe" meaning that [B.A.C.'s] situation was life-threatening.

. . . .

Officer Alan Randolph of the Jackson, Tennessee police department testified that, on or about June 2, 2008, he responded to a shoplifting case at Lowe's in Jackson. The alleged shoplifter was Ms. Cornelius. Officer Randolph testified that Ms. Cornelius was very forthcoming and voluntarily admitted that she had stolen $700 in tools from Lowe's on that date. She advised that she had been dropped off at Lowe's by two men (whom she refused to name) for the purpose and intent of shoplifting. According to Officer Randolph, Ms. Cornelius readily admitted that this was not an isolated event but that she "had been all over town" shoplifting. According to his report, Ms. Cornelius informed Officer Randolph that she had a long-term drug habit, that she needed to support it, that her drug of choice was methamphetamine, and that she was out of money. A burned spoon, two hypodermic needles, and two butane lighters were found in Ms. Cornelius' purse. She acknowledged that these items were used in her drug practice. During her testimony, Ms. Cornelius admits to pleading guilty, on July 3, 2008, to theft of property under $500 and to possession of drug paraphernalia. She admits to a history of criminal activity that includes drug convictions, and violation of probation.

*Cornelius*, 2009 WL 1929157, at *1, 4-5. The juvenile court's order on dependency and neglect found, in pertinent part, that Mother's prenatal use of cocaine amounted to severe child abuse. *Id.* at *1. The circuit court reached the same conclusion in a *de novo* hearing, which this Court affirmed on appeal. *Id.* at *1,7.

More recent testimony revealed that Mother's drug use spiraled "out of control" after the juvenile court's initial ruling in the dependency and neglect case. Francis Wicker ("Ms. Wicker"), a recovering alcoholic who served as one of Mother's Alcoholics Anonymous ("AA") sponsors, testified that Mother actively used cocaine, hydrocodone, dilaudid, and morphine during the summer of 2008. The serious nature of Mother's drug addiction led her to sell and trade her prescription methadone to acquire other drugs. Mother's desperation did not stop there. The evidence at trial showed she stole from local stores, sold her personal belongings, and sold items purchased with food stamps to support her drug habit. Ms. Wicker testified that Mother patronized a local drug dealer on an almost daily basis during June and July of 2008. In addition, Mother admitted that a car accident in July 2008 occurred during an attempt to procure morphine.

-4-

The juvenile court held its first hearing on DCS' termination petition in August 2008 shortly after Mother's drug use reached its most recent peak.[2]  Mother thereafter made verifiable progress towards addressing her addiction.  Mother attended sixty-three AA meetings from July 2, 2008, until February 21, 2009.  She completed a four-week intensive outpatient program through Pathways Behavioral Health Services ("Pathways") on October 8, 2008, and began an aftercare program on December 17, 2008.[3]  Several favorable drug tests supported Mother's claims of progress.  Mother passed a urine screen on July 29, 2008.  She tested negative for drugs in hair follicle tests conducted September 8, 2008, and December 10, 2008.  Mother further testified that she passed every drug test her probation officer administered.

Doubt as to Mother's recovery arose when she tested positive for opiates during a nail clippings test conducted December 2, 2008.  Other questions remained as to Mother's motivation.  DCS suggested that Mother's last-minute efforts resulted due to the stark possibility that she would lose her child and the virtual guarantee that she would serve jail time if she did not attempt to become drug free.  Mother acknowledged that she would likely serve jail time if she violated the probation she received as a result of her theft from Lowe's.  She explained that testing positive for drugs could require her to serve two eleven month and twenty-nine day sentences, which the record shows would run consecutively.

The juvenile court remained unconvinced that Mother had effected a meaningful change in her life.  The court terminated Mother's parental rights after conducting hearings on August 13, 2008; October 14, 2008; December 16, 2008; and February 24, 2009.  The court found grounds of severe child abuse and persistence of conditions, but declined to grant DCS' petition on the ground of substantial noncompliance with the permanency plans.  The court entered an order terminating Mother's parental rights after concluding termination was in the best interests of B.A.C.  Mother timely filed a notice of appeal.

## II. Issues Presented

Mother presents the following issues for our review as restated:

(1)     Whether this Court should overrule its prior decision affirming the finding of severe child abuse;

(2)     Whether the juvenile court erred when it found clear and convincing evidence to support the ground persistence of conditions;

---

[2] DCS filed a petition to terminate Mother's parental rights on April 29, 2008.

[3] Mother previously completed the same program in the fall of 2007, but relapsed after deciding not to enroll in the aftercare program.

(3)     Whether DCS clearly and convincingly proved that termination of
        Mother's parental rights was in the best interests of the child.

### III. Standard of Review

This Court reviews a trial court's findings of fact *de novo* upon the record, according a presumption of correctness to the findings unless a preponderance of the evidence is to the contrary. Tenn. R. App. P. 13(d). This Court will not reevaluate the determinations of a trial court based on an assessment of credibility unless clear and convincing evidence is to the contrary. *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005) (citation omitted). This Court reviews the record *de novo* where the trial court has not made a specific finding of fact. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). No presumption of correctness attaches to a trial court's conclusions of law. Tenn. R. App. P. 13(d); *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000).

Tennessee Code Annotated section 36-1-113 governs the termination of parental rights. The Code provides, in pertinent part:

> (c) Termination of parental or guardianship rights must be based upon:
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

Tenn. Code Ann. § 36-1-113(c)(1)-(2) (2005 & Supp. 2009). This two-step analysis requires courts to consider "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). "Although the 'clear and convincing evidence' standard is more exacting than the 'preponderance of the evidence' standard, it does not require the certainty demanded by the 'beyond a reasonable doubt' standard." *In re M.A.B.*, No. W2007-00453-COA-R3-PT, 2007 WL 2353158, at *2 (Tenn. Ct. App. Aug. 20, 2007)(*no perm. app. filed*). "Clear and convincing evidence is evidence that eliminates any substantial doubt and that produces in the fact-finder's mind a firm conviction as to the truth." *Id.* (citation omitted).

The clear and convincing standard is necessary because parents have a fundamental right to the care and custody of their children. *Santosky v. Kramer*, 455 U.S. 745, 768-69 (1982); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). "No civil action carries with it graver consequences than a petition to sever family ties indelibly and forever." *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *4 (Tenn. Ct. App. Mar. 9, 2004)(*no perm. app. filed*). The termination of parental rights eliminates "all rights, responsibilities, and obligations of the parent[]," Tenn. Code Ann. § 36-1-113(d)(3)(C)(i) (2005 & Supp. 2009), and removes a parent's "right to object to the child's adoption or thereafter, at any time, to have any

relationship, legal or otherwise, with the child." Tenn. Code Ann. § 36-1-113(d)(3)(C)(iii) (2005 & Supp. 2009). The heightened burden of proof in parental termination cases guards against unwarranted severance of the constitutionally protected parent-child relationship. *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

Additionally, "[t]he heightened burden of proof in parental termination cases requires us to distinguish between the trial court's findings with respect to specific facts and the 'combined weight of these facts.'" *In re T.L.N.*, No. M2008-01151-COA-R3-PT, 2009 WL 152544, at *3 (Tenn. Ct. App. Jan. 21, 2009) (*no perm. app. filed*) (citing *In re M.J.B.*, 140 S.W.3d 643, 654 n.35 (Tenn. Ct. App. 2004)). "Although we presume the trial court's specific findings of fact to be correct if they are supported by a preponderance of the evidence, 'we are the ones who must then determine whether the combined weight of these facts provides clear and convincing evidence supporting the trial court's ultimate factual conclusion.'" *Id.* (quoting *In re M.J.B.*, 140 S.W.3d at 654 n.35).

## IV. Analysis

This Court will not reverse a termination decision for failure to establish grounds so long as a preponderance of the evidence clearly and convincingly demonstrates at least one of the statutorily provided grounds for termination. *State, Dep't of Children's Servs. v. Mims*, 285 S.W.3d 435, 449 (Tenn. Ct. App. 2008) (citation omitted). The grounds before this Court are severe child abuse pursuant to Tennessee Code Annotated section 36-1-113(g)(4) and failure to remedy the conditions which led to the child's removal pursuant to Tennessee Code Annotated section 36-1-113(g)(3).

### A. Severe Child Abuse

Tennessee Code Annotated section 36-1-113(g)(4) establishes a ground for termination where a prior court order has found a parent to have committed severe child abuse. Tenn. Code Ann. § 36-1-113(g)(4) (2005 & Supp. 2009). This Court in *Cornelius* affirmed a finding of severe child abuse based on Mother's prenatal drug use. The Tennessee Supreme Court, as of the date of this opinion, has neither granted nor denied permission to appeal our decision in *Cornelius*. In the interim, we are content to rely on the reasoning set forth in *Cornelius* as well that of the recently authored opinion in *In re Benjamin M.*, No. E2009-00209-COA-R3-JV, 2009 WL 3518165 (Tenn. Ct. App. Oct. 30, 2009) (thoroughly addressing the question of whether prenatal drug use may constitute severe child abuse). Having reviewed the record, we hold that clear and convincing evidence supported the juvenile court's decision on the ground of severe child abuse.

### B. Persistence of Conditions

Tennessee Code Annotated section 36-1-113(g)(3) establishes a ground for termination where:

(3)  The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3)(A)-(C) (2005 & Supp. 2009).  A finding on the ground of persistence of conditions is not appropriate unless DCS presents clear and convincing evidence to establish each statutory element.  *In re Giorgianna H.*, 205 S.W.3d 508, 518 (Tenn. Ct. App. 2006) (citing *In re Valentine*, 79 S.W.3d 539, 550 (Tenn. 2002)).

The conditions that led to the removal of B.A.C. were Mother's failure to become drug free and her inability to understand the impact of her substance abuse on the child.  The juvenile court found that these conditions persisted at the time of the termination hearing and would in all probability expose the child to further abuse and neglect.  The court noted that at the time of the hearing Mother was illegally driving on a suspended license, was not consistently attending AA meetings, and was still doing drugs.  The court concluded there was little likelihood that Mother would remedy these conditions at an early date.  The continuation of the parent-child relationship would therefore greatly diminish B.A.C.'s chance of an early integration into a stable and permanent home.

We hold that clear and convincing evidence supported the juvenile court's finding of persistent conditions.  Mother continued to use drugs up to and possibly through the termination hearings.  The positive drug tests of June 10, 2008, and December 2, 2008, are clear and convincing evidence of Mother's continued drug use when considered in light of her arrest for shoplifting, Ms. Wicker's testimony concerning Mother's rampant drug use during July 2008, Mother's admission that she intended to purchase morphine in July 2008, and additional testimony that Mother continued to associate with her drug dealer only a week before the final termination hearing in February 2009.

Considering the totality of the circumstances, Mother demonstrated little likelihood she would remedy her drug use at an early date.  The juvenile court properly considered the

continuing threat of relapse and Mother's demonstrated failure to remain drug free in the past.[4] *See In re J.C.D.*, 254 S.W.3d 432, 443 (Tenn. Ct. App. 2007). Timothy Butler ("Mr. Butler"), an alcohol and drug counselor at Pathways, testified that Mother's efforts in the months preceding the final termination hearing showed she was likely in early partial remission. The court concluded that Mr. Butler's testimony concerning early partial remission was "not close to good enough." We agree with the juvenile court, further noting that Mr. Butler conceded that a positive drug test in December 2008 would alter his opinion about Mother's recovery. We affirm the juvenile court's finding of persistence of conditions.

### C. Best Interests

The final consideration in the present case is whether termination of Mother's parental rights is in the child's best interests. Termination of a parent's rights and responsibilities is appropriate only when clear and convincing evidence establishes that termination is in the best interests of a child. Tenn. Code Ann. § 36-1-113(c)(2) (2005 & Supp. 2009). The General Assembly has established a non-exhaustive list of factors to consider when determining the best interests of a child:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

---

[4] The court's order stated, "With respect to persistence of conditions, the question becomes, how many chances do you give a person? So many women beg for the opportunity to get into treatment for just 28 days and Ms. Cornelius had a year at Teen Challenge and received treatment at the Tony Rice Center."

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i)(1)-(9) (2005 & Supp. 2009). "Every factor need not be applicable in order for the trial court to determine that it is in the best interest of the child for a parent's right[s] to be terminated." *In re D.C.A.*, No. M2008-01279-COA-R3-PT, 2009 WL 837877, at *8 (Tenn. Ct. App. Mar. 30, 2009) (*no perm. app. filed*). The weight and relevance of these factors may vary from case to case and it is possible that a single factor is determinative. *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)).

The juvenile court offered an lengthy list of reasons it believed termination was in the best interests of B.A.C. The court found that Mother failed to make an adjustment of circumstances, conduct, or conditions to make it safe for the child's return and failed to effect a lasting adjustment after reasonable efforts by social services for such duration of time that lasting adjustment did not appear reasonably possible. The court additionally found that Mother remained unable to care for the child in a safe and stable manner, Mother exposed B.A.C. to harm after numerous warnings that drug use during her pregnancy could injure the child, and Mother continued to have contact with the same individuals she associated with during the period she admittedly used drugs. While not addressing the bond between Mother and child, the court found that B.A.C. established a strong bond with the foster parents, who wished to adopt the child.

Perhaps the most important findings related to the special needs of B.A.C. that have arisen due to Mother's extensive prenatal drug use. The court's order stated:

38. Since [B.A.C.] came into custody, he has received, and still receives, speech therapy, physical therapy, feeding therapy as well as services from TEIS (Tennessee Early Intervention Services) and from his foster parent who is a licensed respiratory therapist; supervised visitation with his mother; and other such services.

. . . .

54. A change of caretaker and physical environment is likely to have a negative effect on the child's emotional, psychological and/or medical condition. This child is very special needs and he may have significant deficits and require specialized life long attention. [Mother] has not acquired significant skills to work with this child.

. . . .

65. The Court specifically finds by clear and convincing evidence that termination is in the best interest of the child as the child cannot go back and live with the mother today due to safety issues and due to the conditions and regimens that he needs.

66. The Court specifically finds by clear and convincing evidence it would not be in his best interest to be put in a situation where he would be at risk for removal again as any change is devastating to him.

The record, on the whole, strongly supports the juvenile court's determination on best interests. Dr. Lisa Piercey explained that children in B.A.C.'s condition are "often very irritable and sometimes have difficulty controlling behavior." The record is rife with testimony describing the special needs and unique behaviors of B.A.C. that have arisen due to his prenatal exposure to drugs. Because of Mother's inability to remain drug free, B.A.C. is a developmentally delayed young child who demands constant structure in his life. Any variation in his daily routine can have a severe impact on B.A.C., both physically and emotionally. Unfortunately, the totality of B.A.C.'s special needs are still unknown. Cathi Kennedy ("Ms. Kennedy"), service coordinator for the Tennessee Early Intervention System, observed many "red flags" that could indicate undiagnosed developmental problems. For example, Ms. Kennedy observed eight characteristics of autism and sensory processing disorder in B.A.C.'s behavior. Ms. Kennedy unfortunately was not able to fully investigate these potential problems during her initial assessment, but was working to schedule an evaluation of B.A.C. at Vanderbilt. These facts combine to depict a highly rewarding, but highly stressful obligation to constantly care for the special needs of this child. The best interests of B.A.C. require a placement that can provide that special attention not for a day, week, or month, but for a minimum period of several uninterrupted years. Ms. Kennedy testified that B.A.C. "must, at this point, have a consistent routine and consistent schedule or he is not going to be able to learn to interpret his environment, and will continue to be delayed."

From all accounts, the current foster family and potential adoptive placement has the skill and ability to care for B.A.C. The foster mother is a registered nurse and has already demonstrated an ability to keep B.A.C. on a strict schedule. Chanelle Alexander ("Ms. Alexander"), early intervention teacher with the Kiwanis Center, testified that there are no concerns as to the foster parents. After having the opportunity to observe the foster parents' home, Ms. Alexander found no environmental concerns, no concerns with the interaction between parent and child, no concerns about B.A.C.'s safety, and no concerns about the foster mother's commitment to caring for B.A.C.

There are, however, many concerns as to Mother's ability to care for B.A.C. over time. One overriding concern is Mother's inability to remain drug free. Mr. Butler explained that with Mother's condition "[w]e're talking about a chronic illness. We're not talking about a cure,

-11-

we're talking about remission." Continuing threats to Mother's sobriety include withdrawal; stress; and people, places, and things from her past. Mr. Butler testified that obtaining a sponsor is critical to functioning with potential aggravating factors. Despite her recent efforts at recovery, Mother has not abstained from associating with the people from her past, nor has she obtained a sponsor to help her struggle forward with a long recovery.[5] These facts are highly disconcerting given the undeniable strain caring for B.A.C. would place on Mother's daily life.

Caring for B.A.C. will be an arduous and difficult undertaking. Ms. Kennedy testified that children of B.A.C.'s nature can be significant financial and emotional stressors. Complications from Mother's drug use will continue to affect his development as a young child. No one knows what additional difficulties he and his caretaker may encounter.[6] We are not convinced that Mother is ready to bear this considerable burden. Laura Shackleford ("Ms. Shackleford"), Mother's family services worker, testified that stress has caused Mother to use drugs before.[7] Karen Broughton, a foster parent who has cared for many medically fragile children, stated that she did not believe Mother was physically or emotionally ready to care for B.A.C. These are glaring concerns given that even a single relapse is capable of setting off a chain of events that would severely and detrimentally affect B.A.C.'s development.

We acknowledge that not all factors run contrary to Mother's position. Mr. Butler explained that loss of custody can be a motivating factor. Potential loss of custody and loss of freedom appear to have motivated Mother to make some belated progress towards reunification with B.A.C. Ms. Shackleford testified that there has been a change in Mother since the filing of the termination petition and since the initial court hearing in August 2008. Lena Bush with the Carl Perkins Center testified that Mother became more attached, more concerned, and more caring. Testimony at trial showed that Mother began to mature emotionally. She ultimately opened up to those offering services, actively participated in parenting classes, regularly attended visitation, and ostensibly established a bond with B.A.C.

We nonetheless conclude that clear and convincing evidence supported the juvenile court's decision that termination was in the best interests of B.A.C. Mother's failure to remain drug free during her pregnancy was not in the best interests of her child. Mother's failure to

---

[5]Mother's most recent sponsor, the aforementioned Ms. Wicker, quit associating with Mother in July 2008.

[6]For example, there is a real possibility that B.A.C. may experience extreme discomfort while adjusting to changes in the barometric pressure. Karen Broughton explained that similarly situated children have cried for up to four days straight.

[7]This is not the only indication that Mother has a history of using drugs to cope with life's difficulties. Mother candidly admitted at trial that she self-medicated her anxiety and depression for many years. Ms. Shackleford expressed concern that Mother would similarly turn to non-prescribed or illegal drugs to cope with persistent back pain, just one of Mother's various physical ailments. Further, Mother suggested in her brief that she tested positive for drugs in June 2008 as a result of the filing of DCS' termination petition: "Certainly, the filing of the Petition is not an excuse for Mother to relapse, but it may offer an explanation." The possibility that Mother may have relapsed as an adverse reaction to a stressful situation is exactly the type of circumstance that causes this Court concern.

remain drug free during these proceedings was again not in the best interests of her child. The possibility that Mother's failure to remain drug free will once more delay B.A.C.'s development into a healthy and happy child is a possibility we are not willing to indulge. The General Assembly has provided that if "the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child, which interests are hereby recognized as constitutionally protected and, to that end, this part shall be liberally construed." Tenn. Code Ann. § 36-1-101(d) (2005). To the extent there is conflict here, we conclude that the best interests of B.A.C. weigh in favor of terminating Mother's parental rights.

### V. Conclusion

For the foregoing reasons, we affirm the juvenile court's judgment terminating the parental rights of Mother. Costs of this appeal are assessed to the appellant, Rebecca Cornelius.

_____
DAVID R. FARMER, JUDGE