IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 1, 2017

## IN RE QUINTIN S., ET AL.

**Appeal from the Juvenile Court for Claiborne County**
**Nos. 2012-JV-1106, 2015-JV-1560, 2016-JV-1701     Robert M. Estep, Judge**

_____

### No. E2016-02150-COA-R3-PT

_____

The Department of Children's Services filed this petition to terminate the parental rights of the mother and two fathers of four children on various grounds.  We affirm the termination of the parental rights of all three parents on multiple grounds, but reverse as to some of the grounds found by the trial court. We agree with the trial court's decision that termination of parental rights is in the best interest of the children.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part, Reversed in Part, and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., and KENNY W. ARMSTRONG, JJ., joined.

James Dallard Estep, III, Tazewell, Tennessee, for the appellant, Shawn H.

Jordan Chandler Long, Knoxville, Tennessee, for the appellant, Christopher F. K., III.

Mary Catherine O'Donnell, Blaine, Tennessee, for the appellant, Areia Y. K.

Herbert H. Slatery, III, Attorney General and Reporter, Andrée Blumstein, Solicitor General, and Alexander S. Rieger, Deputy Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

### OPINION

FACTUAL AND PROCEDURAL BACKGROUND

Areia Y.K. ("Mother") is the biological mother of the four children at issue in this parental termination appeal:  Quintin S., born in March 2007; Aglacia H., born in June 2010; Zavera S., born in October 2012; and Christopher F.K., IV ("Christopher IV"),

born in December 2014. The rights of two fathers are at issue in this appeal. Shawn H. is the legal father of Aglacia because his name appears on her birth certificate; and DNA testing established him as Zavera's biological father. Christopher K., III ("Christopher III"), is the legal father of Christopher IV because he was married to Mother at the time of Christopher IV's birth.[1]

The Department of Children's Services ("DCS" or "the Department") first became involved with Mother and her children in 2012. When Zavera was born in October 2012, Mother admitted taking opiates without a prescription while pregnant, and the child was born with neonatal abstinence syndrome ("NAS"). The Department filed a petition to transfer temporary legal custody on November 9, 2012. Shawn H. was incarcerated, and the whereabouts of the father of Quintin S. were unknown. The juvenile court determined that the three children were dependent and neglected and awarded temporary custody to Lois R., the maternal grandmother. In March 2013, Mother was determined to be free of opiates, and the children were returned to her custody.

On April 22, 2014, DCS once again brought Quintin, Aglacia, and Zavera into its custody and filed a petition for temporary legal custody the following day that includes the following pertinent allegations of dependency and neglect:

a. On April 22, 2014, CPSI Rachel Kilgore received a referral with allegations of drug exposed child. CPSI Kilgore met with Quinton [S.] at school. Quinton stated that he had not had a bath in a week and could not remember the last time he brushed his teeth because there is no running water in the home. He stated that he cannot flush the toilet and it has to stay dirty.
b. During the investigation and home visit, [Mother] consented to a urine drug screen. She tested positive for oxycodone and opiates. [Mother] admitted to snorting an oxycodone on 4/20/14 without a valid prescription.
c. [Christopher III] consented to a drug screen and tested positive for oxycodone. [Christopher III] admitted to orally [taking] a Percocet that he did not have a valid prescription for on 4/18/14.
d. Additionally, there is no running water in the home and no refrigerator.

The Department requested that the children be taken into its custody and that they be found dependent and neglected at a final hearing.[2] A hearing was held on May 14, 2014,

---

[1] James S., the legal father of Quintin S., surrendered his parental rights to the child in October 2015. Thus, his rights are not at issue in this appeal.
[2] Lois R., the maternal grandmother, subsequently filed a petition to intervene and attempted, unsuccessfully, to be awarded custody of the children. As Ms. R. is not a party to this appeal, we will not address the proceedings or rulings related to her rights.

and the juvenile court entered an order on June 16, 2014 finding the children dependent and neglected.

Christopher IV was born in December 2014. Christopher IV's umbilical cord blood tested positive for opiates; he was diagnosed with NAS and treated with morphine to alleviate his withdrawal symptoms. The Department immediately petitioned the juvenile court to take him into protective custody due to drug exposure.[3]

On July 29, 2015, DCS filed a petition to terminate the parental rights of Mother, Shawn H., and Christopher III. The Department alleged the following grounds for termination: (1) abandonment by failure to visit (all parties); (2) abandonment by failure to support (all parties); (3) abandonment by incarcerated parent/failure to visit (Mother and Christopher III); (4) abandonment by incarcerated parent/failure to support (Mother and Christopher III); (5) abandonment by incarcerated parent/wanton disregard (Mother and Christopher III); (6) abandonment by failure to provide suitable home (Mother and Christopher III); (7) substantial noncompliance with permanency plan (all parties); (8) persistence of conditions (Mother and Christopher III); and (9) severe child abuse (all parties). The hearing took place over three days in August 2016. (We will discuss the testimony and evidence presented at trial below as pertinent to our analysis of the issues on appeal.) The trial court found that the following grounds for termination had been proven by clear and convincing evidence: Mother—grounds one through eight; Shawn H., with respect to Aglacia and Zavera—grounds one, two, and seven; and Christopher III, with respect to Christopher IV—grounds one, three, five, six, seven, and eight. The court also found that it was in the children's best interest for the parental rights of Mother, Shawn H., and Christopher III to be terminated.

All three parents, Mother, Shawn H., and Christopher III, have appealed. In accordance with *In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016), this court "must review the trial court's findings as to each ground for termination and as to whether termination is in the child[ren]'s best interests, regardless of whether the parent challenges these findings on appeal."

STANDARD OF REVIEW

Under both the federal and state constitutions, a parent has a fundamental right to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996). This right is not absolute, however. If a compelling state interest exists, the state may interfere with parental rights. *Nash-Putnam*, 921 S.W.2d at 174-75 (citing *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994)). Our

---

[3] The petition regarding Christopher IV was originally filed in Hamblen County, but it was later transferred to Claiborne County and consolidated with the case involving the other three children.

legislature has enumerated the grounds upon which termination proceedings may be brought. *See* Tenn. Code Ann. § 36-1-113(g). A parent's rights may be terminated only where a statutory ground exists. *In re Matter of M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

Because terminating a parent's fundamental parental rights has severe consequences, termination cases require a court to apply a higher standard of proof. *State Dep't of Children's Servs. v. A.M.H.*, 198 S.W.3d 757, 761 (Tenn. Ct. App. 2006). First, a court must determine by clear and convincing evidence that at least one of the statutory grounds for termination exists. Tenn. Code Ann. § 36-1-113(c)(1); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). After a court makes this determination, a court must find by clear and convincing evidence that termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c)(2); *In re Valentine*, 79 S.W.3d at 546. "Clear and convincing evidence 'establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *In re Serenity B.*, No. M2013-02685-COA-R3-PT, 2014 WL 2168553, at *2 (Tenn. Ct. App. May 21, 2014) (quoting *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004) (citations omitted)).

Because of the heightened standard of proof required in termination cases, we must adapt the customary standard of review established by Tenn. R. App. P. 13(d). *Id.* In accordance with Tenn. R. App. P. 13(d), we review the trial court's findings of fact de novo with a presumption of correctness unless the evidence preponderates otherwise. *Id.* Next, we must determine whether the facts establish by clear and convincing evidence the elements necessary to terminate parental rights. *In re M.J.B.*, 140 S.W.3d at 654.

ANALYSIS

I.       Grounds For Termination

A.  Abandonment by failure to visit prior to filing of petition

A parent's rights may be terminated upon proof by clear and convincing evidence that the parent "abandoned" his or her child. Tenn. Code Ann. §§ 36-1-113(c)(1), (g)(1). There are a number of different statutory definitions of abandonment. *See* Tenn. Code Ann. § 36-1-102(1)(A). Tennessee Code Annotated section 36-1-102(1)(A)(i) defines abandonment as follows:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have *willfully* failed to

visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child[.]

(Emphasis added). A court must find that the abandonment was "willful." Tenn. Code Ann. § 36-1-102(1)(A)(i). The statutory definition of "willfully failed to visit" is "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). Tennessee Code Annotated § 36-1-102(1)(C) defines "token visitation" as "perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." To establish willfulness in this context, a petitioner must show that "a parent who failed to visit or support had the capacity to do so, made no attempt to do so, and had no justifiable excuse for not doing so." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013); *see also In re Audrey S.*, 182 S.W.3d 838, 863-64 (Tenn. Ct. App. 2005) (stating that a person acts willfully if he or she knows what he or she is doing and has the intention to do what he or she is doing). "Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law." *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007)). A parent will not be found to have abandoned his or her child if his failure to visit the child is not within his or her control. *Id.*

Because Mother and Christopher III were incarcerated during the four months prior to the Department's filing of the petition for termination, DCS has conceded the ground of abandonment by failure to visit during the four-month period prior to the filing of the petition with respect to Mother and Christopher III. We agree that DCS has not established this ground by clear and convincing evidence as to Mother or Christopher III. We, therefore, reverse the trial court's termination of their parental rights on this ground.

We proceed, then, to address this ground as to Shawn H. In this case, DCS filed the termination petition on July 29, 2015. Thus, the relevant time period under Tenn. Code Ann. § 36-1-102(1)(A)(i) is March 29 to July 28, 2015. Although Shawn H. was incarcerated for significant periods of time, he was out of jail from August 2014 to August 2015. Therefore, the four-month period set forth in Tenn. Code Ann. § 36-1-102(1)(A)(i) is the appropriate statutory ground applicable to him.

During this period of time, Shawn H. visited his children only once, in June 2015. All of the permanency plans provide that the parents are entitled to at least 4.3 hours of visitation per month. Ashley Jennings, the case manager, testified that, after initially having only one four-hour visit per month, she altered the visitation schedule to allow the parents two two-hour visits per month. She sent each parent a letter outlining the details about visitation—location, dates, times, and the importance of being there on time.

Shawn H. argues on appeal that he was only allowed eight supervised visits during the four months at issue and that one two-hour visit amounts to more than token visitation. We respectfully disagree. The record shows that, during the relevant four-month period, DCS allowed Shawn a total of sixteen hours of visitation, and he used only two. Moreover, the record contains evidence that his failure to participate in more than token visitation was willful. At the hearing, Shawn H. testified that he had problems with transportation because he lost his license. He could ride with his mother, but he had problems paying for the gas. Shawn H. also acknowledged that he could get a ride through ETHRA,[4] but he stated that he had trouble paying the "couple of dollars" required to use the service.

The trial court found that Shawn H. had abandoned Aglacia and Zavera by a willful failure to visit pursuant to Tenn. Code Ann. § 36-1-102(1)(A)(i). We conclude that clear and convincing evidence supports this determination.

B. Abandonment by failure to support prior to filing of petition

Due to their incarceration, DCS has also conceded the ground of willful failure to support during the four-month period prior to the filing of the petition with respect to Mother and Christopher III. We agree that DCS failed to prove this ground of abandonment by failure to visit by clear and convincing evidence as to Mother or Christopher III. We, therefore, reverse the trial court's termination of their parental rights on this ground.

Using the statutory definition of abandonment set forth above, we now address the ground of willful failure to support as to Shawn H. Pursuant to Tenn. Code Ann. § 36-1-102(1)(D), "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" means "the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." "[T]oken support" is defined to mean "that the support, under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B). Shawn H. was required to pay $100 per month per child ($200 per month) in child support. He concedes that he did not pay any child support for his two children.

To prove abandonment by willful failure to support, DCS must prove by clear and convincing evidence that Shawn H. "had the capacity to pay support but made no attempt to do so and did not possess a justifiable excuse." *In re Adoption of Angela E.*, 402 S.W.3d at 641. It is not enough for DCS to "'simply prove that [Father] was not disabled during the relevant timeframe' and therefore assume that [he] was capable of working

---

[4] ETHRA stands for East Tennessee Human Resources Agency, which provides public transportation services.

and paying child support." *In re Noah B.B.*, No. E2014-01676-COA-R3-PT, 2015 WL 1186018, at *9 (Tenn. Ct. App. Mar. 12, 2015) (quoting *In re Josephine E.M.C.*, No. E2013-02040-COA-R3-PT, 2014 WL 1515485, at *18 (Tenn. Ct. App. Apr. 17, 2014)). According to the testimony of Shawn H., he applied during the relevant time period for jobs at restaurants, sawmills, and factories without success. He managed to pay his fines and court costs by working odd jobs, collecting scrap metal, and obtaining help from his mother. Shawn H. testified that he sometimes took morphine twice a week; he did odd jobs in exchange for the drugs or paid ten or fifteen dollars for the drugs. Shawn H. lived with his mother during this time period.

Contrary to the Department's argument, we do not consider Shawn H.'s drug habit and payment of court fines sufficient evidence of a willful failure to support his children. The Department failed to present enough evidence to "'eliminate[] any serious or substantial doubt'" that Shawn H. had the ability to pay support and that his failure to support his children was, therefore, willful. *In re Serenity B.*, 2014 WL 2168553, at *2 (quoting *In re M.J.B.*, 140 S.W.3d at 653).

We, therefore, reverse the trial court's termination of Shawn's H.'s parental rights on the ground of willful failure to support.

### C. Abandonment by failure to visit prior to incarceration

The version of Tenn. Code Ann. § 36-1-102(1)(A)(iv) applicable to this case defines abandonment as follows:

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has *willfully* failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

(Emphasis added).

#### 1. Mother

Under Tenn. Code Ann. § 36-1-102(1)(A)(iv), the relevant time period for abandonment for willful failure to visit is the four-month period prior to Mother's incarceration. Mother argues that her brief incarceration on January 30, 2015 means that

the relevant time period runs from September 28, 2014 to January 29, 2015. The Department asserts that a few hours in jail does not trigger Tenn. Code Ann. § 36-1-102(1)(A)(iv) and that the relevant time period runs from December 30, 2014 to April 30, 2015, which is the four months prior to Mother's incarceration from May 1 to May 28, 2015.

In two previous cases involving the wanton disregard ground under Tenn. Code Ann. § 36-1-102(1)(A)(iv), this court "took the reasoned position . . . that a parent spending a few hours in jail does not rise to the level" necessary to qualify for the protections of the statute. *In re Kaitlin W.*, No. E2015-01553-COA-R3-PT, 2016 WL 2931326, at *8 (Tenn. Ct. App. May 16, 2016) (citing *In re Courtney N.*, No. E2012-01642-COA-R3-PT, 2013 WL 2395003, at *7 (Tenn. Ct. App. May 31, 2013)). We find that this reasoning likewise applies here to Mother's brief stay in jail on January 30, 2015. The case cited by Mother involves a period of incarceration lasting two days and is, therefore, distinguishable from the present case. *See In re Eddie F.*, No. E2016-00547-COA-R3-PT, 2016 WL 7029285, at *4 n.6 (Tenn. Ct. App. Dec. 2, 2016) (measuring four-month time period for failure to support from mother's two-day incarceration). Thus, the relevant time period for purposes of determining Mother's abandonment by failure to visit during the four months prior to her incarceration is December 30, 2014 to April 30, 2015.

During the relevant time period, Mother visited the children three times, once in February 2015 and twice in April 2015. Mother acknowledged that she received the letters from Ms. Jennings and knew that she had the opportunity to visit the children twice a month. When asked about her failure to exercise more visitation, Mother testified:

A. . . . I was struggling with my addiction and doing probation right [sic], so I knew if I went for a visit, I would be arrested.
Q. So you chose not to go see your children because you knew that you would be arrested?
A. Yeah.

Mother argues that the trial court's finding that her failure to visit was willful is inconsistent with her request for relief from the trial court due to her dissatisfaction with the visitation offered. Unlike the present case, the case relied upon by Mother, *In re Jakob O.*, No. M2016-00391-COA-R3-PT, 2016 WL 7243674, at *5 (Tenn. Ct. App. Dec. 15, 2016), involved a mother's efforts to reinstate visitation after the trial court's entry of an order suspending her visitation rights. While the *In re Jakob O.* appellate court found that the mother should not be assigned fault for failing to exercise visitation during the period of suspension, the court found no error in the trial court's determination that the mother's three visits during the three months after the reinstatement of visitation amounted to only token visitation. *In re Jakob O.*, 2016 WL 7243674, at *6.

In the present case, after a hearing on December 5, 2014 at which the court determined that DCS had not received proper notice, the trial court entered an order on December 18 stating, in pertinent part:

> The mother informed the Court however that she was not getting her supervised visitation. When counsel for the Department was reached via teleconference, counsel for the Department could not dispute the mother's allegations as her client was not available to question. Therefore, the Court ordered the Department to create a visitation plan by December 15, 2014 or a plan would be created by the Court. The supervised visitation will occur at the Morristown Mall play area.
> The supervised visitation plan emailed to counsel on 12/9/14 is as follows:
>> December 16, 2014:  5:00PM-7:00PM
>> December 30, 2014:  5:00PM-7:30PM
>> January 13, 2015:  5:00PM-7:00PM
>> January 27, 2015:  5:00PM-7:30PM
>> February 10, 2015:  5:00PM-7:00PM
>> February 24, 2015:  5:00PM-7:30PM

In an affidavit of reasonable efforts dated September 10, 2015, Ms. Jennings stated that, on February 10, 2015, she set up the following additional visits with the parents:  March 9, 2015; March 23, 2015; April 7, 2015; and April 21, 2015.  Out of the nine visits set up for Mother during the relevant time period, Mother attended only three, and the trial court found that Mother's visits constituted only "token visitation."  The evidence does not preponderate against this finding, which supports the trial court's conclusion that, pursuant to Tenn. Code Ann. § 36-1-102(1)(E), the failure to visit was willful.

We conclude that there is clear and convincing evidence to support the termination of Mother's parental rights on the ground of abandonment by willful failure to visit during the four-month period prior to incarceration pursuant to Tenn. Code Ann. § 36-1-102(1)(A)(iv).

2.  Christopher III

Christopher III testified that he was incarcerated for theft for approximately two to three days in June 2015, but there is nothing in the record to establish the exact dates of his incarceration.  Citing *In re Addison B.*, No. M2014-02265-COA-R3-PT, 2015 WL 2258232, at *2 (Tenn. Ct. App. May 13, 2015), Christopher III emphasizes the fact that the trial court never identified an exact period of incarceration.  We do not find this distinction to be important.  Even if we assume that Christopher III was incarcerated at the beginning of June 2015, there is no dispute that he attended only two visits (both in April 2015) during the preceding four-month period, February to May 2015.

As stated above, DCS offered the parents two visits per month. Thus, Christopher III attended only two of eight visits available to him during the relevant four-month time period. At the hearing, Christopher III testified that he did not have a driver's license and found ETHRA not to be dependable. As a result, he chose to ride his bicycle to visits. According to Christopher III, Ms. Jennings did not assist him with transportation and never offered him a ride. Ms. Jennings testified that Christopher III "wanted to do everything on his own." She stated that, if Christopher III asked her for help, she would provide help.

The trial court determined that Christopher III's visitation prior to his incarceration was "token at best." The evidence does not preponderate against this finding. Pursuant to Tenn. Code Ann. § 36-1-102(1)(E), therefore, his failure to visit was willful. There is clear and convincing evidence to support the trial court's termination of Christopher III's parental rights on the ground of abandonment by willful failure to visit during the four-month period prior to incarceration pursuant to Tenn. Code Ann. § 36-1-102(1)(A)(iv).

### D. Abandonment by failure to support prior to incarceration

#### 1. Mother

Mother was ordered to pay $118 per month per child. Mother made occasional payments. She testified that she worked, off and on over the past six years, for a housecleaning company earning around $400 a week. During the relevant time period, however, Mother was not working. When Christopher IV was taken away from her after his birth in December 2014, Mother became depressed, stopped working, and started using drugs again. Mother testified: "I neglected child support, my probation and everything else. I gave up on—I gave up on myself for a little bit until I could find myself again." When asked if she decided she could not "handle working at that point," Mother responded that she "needed to work on my depression and get some help with my addiction." Mother further testified that, during much of that time, she was homeless. The Department's position is that "Mother's decision to buy drugs rather than pay child support constituted a willful failure to support her children."

As stated above, DCS must prove by clear and convincing evidence that Mother "had the capacity to pay support but made no attempt to do so and did not possess a justifiable excuse." *In re Adoption of Angela E.*, 402 S.W.3d at 641. The Department failed to present clear and convincing evidence that Mother had the capacity to pay child support during the relevant time period. We, therefore, reverse the trial court's termination of Mother's parental rights on this ground.

- 10 -

2.  Christopher III

In its brief, DCS declined to challenge the trial court's denial of the ground of willful failure to support during the four months prior to incarceration as to Christopher III. According to Christopher III's unrefuted testimony, he had a job and was current on his child support payments. We affirm the decision of the trial court denying this ground for terminating Christopher III's parental rights.

E.  Abandonment by wanton disregard

One of the definitions of abandonment included in Tenn. Code Ann. § 36-1-102(1)(A)(iv), quoted in full above, is that "the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child." Unlike the other forms of abandonment included in Tenn. Code Ann. § 36-1-102(1)(A)(iv), abandonment by wanton disregard is not limited to the four months immediately preceding the parent's incarceration. *In re Audrey S.*, 182 S.W.3d at 871. In fact, "the conduct may occur before the birth of the child whose welfare is thereby put at risk." *In re T.M.H.*, No. M2008-02427-COA-R3-PT, 2009 WL 1871873, at *7 (Tenn. Ct. App. June 29, 2009). The wanton disregard test for abandonment "reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child." *In re Audrey S.*, 182 S.W.3d at 866. Although incarceration alone is not sufficient to prove abandonment, "[a] parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child." *Id.* A parent's incarceration acts as "a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id.* This court has "repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *Id.* at 867-68.

1.  Mother

Mother's position on this issue is that the trial court erred in focusing on actions that occurred subsequent to the Department's removal of Christopher IV from her custody, whereas the statute requires that wanton disregard be based upon her "conduct prior to incarceration." Tenn. Code Ann. § 36-1-102(1)(A)(iv). We agree with Mother's interpretation of the statute. As discussed above, however, the pertinent period of incarceration is May 1 to 28, 2015. Mother's conduct prior to that time is relevant on the issue of wanton disregard.

- 11 -

Mother has a long history of drug use. After Aglacia was born, she began using "Roxies" (roxicontin) and opiates. When she was pregnant with Zavera, Mother was taking opiates. She began struggling with her addiction and trying to get clean during the pregnancy. Mother's three children were removed from her custody in November 2012, but were returned to her in March 2013 when she was free of opiates. The three children were taken into DCS custody again in April 2014, and Mother tested positive for oxycodone and opiates at that time. Mother and Christopher III were arrested and charged with theft under $500 in September or October 2014, and Mother was placed on probation. When she learned that she was pregnant with Christopher IV, Mother began attending rehabilitation and taking subutex; she admitted also taking suboxone that was not prescribed for her. As pointed out by the trial court, after Christopher IV's removal in December 2014, Mother continued to use drugs (methamphetamine and opiates). She also violated her probation, leading to her incarceration in May 2015.

Mother's chronic drug abuse and inability to maintain sobriety as well as her criminal behavior, probation violation, and unstable housing[5] exhibit a wanton disregard for the welfare of her children. We conclude that there is clear and convincing evidence to support the trial court's termination of Mother's parental rights based upon the ground of wanton disregard for the welfare of her children prior to incarceration.

2. Christopher III

For Christopher III, the relevant period of incarceration is June 2015. Any conduct prior to that time may be pertinent to the wanton disregard analysis. Some of the conduct cited by the trial court occurred after the relevant time period.

Christopher III asserts that the wanton disregard ground does not apply to him because there was no dependency and neglect determination until the termination order. He cites two cases in which the children were adjudicated dependent and neglected prior to the termination proceedings. *See In re Serenity L.*, No. E2014-02475-COA-R3-PT, 2015 WL 4594520, at *1 (Tenn. Ct. App. July 31, 2015); *In re Garvin M.*, No. E2013-02080-COA-R3-PT, 2014 WL 1887334, at *1 (Tenn. Ct. App. May 9, 2014). Neither of these cases, however, holds that such an order is a prerequisite for applying the wanton disregard ground, and the plain language of the statute does not require a dependency and neglect order to base a termination of parental rights on this ground. We reject Christopher III's argument.

As stated above, Mother and Christopher III were arrested and charged with theft under $500 in September or October 2014. Christopher III was incarcerated and then released on bond. He was incarcerated again in December 2014 on an earlier theft charge from 2012 for theft over $1000; he was again released on bond. Christopher III was

---

[5] As stated in section D.1., Mother was homeless for a period of time after Christopher IV's birth.

incarcerated again in June 2015 in relation to the previous theft charges. Christopher III admitted using suboxone once during Mother's pregnancy with Christopher IV, and he failed a drug screen for suboxone during the pregnancy. In January 2015, after Christopher IV had been removed by DCS, Christopher III failed another drug test.

While this court recognizes that Christopher III has exhibited the ability to provide support, his criminal behavior, probation violations, substance abuse, and incarcerations exhibit a wanton disregard for the welfare of his child. We conclude that there is clear and convincing evidence to support the trial court's termination of his parental rights based upon the ground of wanton disregard for the welfare of his child prior to incarceration.

## F.   Abandonment by failure to provide a suitable home

The ground of abandonment by failure to provide a suitable home requires a final dependency and neglect order. Tenn. Code Ann. § 36-1-102(1)(A)(ii). There is no final dependency and neglect order regarding Christopher IV because his adjudication as dependent and neglected was combined with the termination of parental rights trial. As a result, DCS has conceded this ground with respect to Mother's and Christopher III's rights to Christopher IV. We agree that this ground of abandonment has not been proven by clear and convincing evidence as to Christopher IV. We, therefore, reverse the trial court's termination of the parental rights of Mother and Christopher III with respect to Christopher IV on this ground.

The remaining issue under this ground is whether the trial court properly found by clear and convincing evidence that Mother abandoned her other three children by failing to provide a suitable home. Abandonment by failure to provide a suitable home occurs under the following circumstances:

> The child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a

- 13 -

lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii).  Thus, the statute requires the Department to prove, with respect to the relevant four-month time period, three elements:  (1) the parent has failed to make reasonable efforts to provide a suitable home, (2) DCS has "made reasonable efforts to assist the parent . . . to establish a suitable home," and (3) the parent has "demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date."  Tenn. Code Ann. § 36-1-102(1)(A)(ii).

In this context, the relevant four-month time period is April 23 to August 23, 2014.  Mother's oldest three children were removed from her custody on April 22, 2014 due to environmental neglect and drug exposure.  Mother argues that she obtained a suitable home during this time period when she moved to King Avenue in Morristown, a place Ms. Jennings described as being "nice," with the exception of some broken windows.  An affidavit of reasonable efforts completed by Ms. Jennings on November 6, 2014 indicates that Mother did not, however, remain at the King Street address for more than a few months. As of July 22, 2014, she reported to Ms. Jennings that she was homeless and staying wherever she could.

Moreover, in this context, a "suitable home" means "'more than a proper physical living location.'"  *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014) (quoting *State v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007)).  A suitable home must "be free of drugs and domestic violence." *Id.*  Mother refused a drug screen on May 29, 2014.  As of November 6, 2014, she had not completed the alcohol and drug assessment required by her permanency plan.  She failed to maintain any contact with the Department from May 30 through July 22, 2014, and she tested positive for subutex on September 25 and October 24, 2014.  On September 25, 2014, Mother reported that she was attending a recovery program for her addiction.  She also stated, in September 2014, that she was five months pregnant and had snorted opanas two months earlier.  Ms. Jennings submitted a referral for adult case services to help Mother complete the steps on her permanency plan.   As of November 6, 2014, Mother had not submitted documentation of assessments as required by her permanency plan.

Pursuant to Tenn. Code Ann. § 36-1-102(1)(A)(ii), DCS must make reasonable efforts to assist the parents to find suitable housing.  "Reasonable efforts" has been

defined to mean "the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1); *see In re C.L.M.*, No. M2005-00696-COA-R3-PT, 2005 WL 2051285, at *9 (Tenn. Ct. App. Aug. 25, 2005) (applying Tenn. Code Ann. § 37-1-166(g)(1) definition to case involving abandonment by failure to provide suitable home). It should be noted that, "the Department does not bear the obligation to establish a suitable home alone, and parents must make their own efforts at reunification." *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016) (citing *In re C.L.M.*, 2005 WL 2051285, at *9) (noting that "reunification is a 'two-way street'")).

Ms. Jennings's affidavit of reasonable efforts dated November 6, 2014 documents the Department's efforts during and immediately after the relevant time period. On May 29, 2014, Ms. Jennings went to the maternal grandmother's home to do a random drug screen with Mother, but Mother refused the drug screen. On June 11, Ms. Jennings called to remind Mother of the permanency plan hearing. On June 23, Ms. Jennings called Mother to tell her about the children moving to their maternal grandmother's home, but she was not able to reach Mother and Mother never called her back. On August 4, Ms. Jennings called Mother to let her know that the children were moving to another foster home. On August 6, Ms. Jennings called the maternal grandmother to ask for her help getting in touch with Mother, but the maternal grandmother did not call back. By August 22, 2014, Ms. Jennings had not talked to Mother since a team meeting on July 22, 2014; Mother called and scheduled a meeting with Ms. Jennings on August 29 to discuss steps on the permanency plan. Ms. Jennings and Mother saw one another during a parent/child visit on August 26, 2014. Mother did not attend the scheduled meeting on August 29. On September 24, Ms. Jennings drove to the maternal grandmother's home, picked Mother up, and drove her to the DCS office for a drug screen, pill count, and to fill out a referral for adult case services. Mother tested positive for subutex, her pill count was accurate, and she agreed to work with Health Connect. The Department presented clear and convincing evidence that it made reasonable efforts to assist Mother to find suitable housing during the relevant period.

The Department's efforts "to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal." Tenn. Code Ann. § 36-1-102(1)(A)(ii). Part of Mother's responsibilities under the permanency plan was to maintain contact with the Department. Mother's lack of contact with the Department, coupled with her persistent drug use and failure to establish a stable home during the relevant time period, evidences insufficient effort.

Finally, as to the third prong of the suitable home analysis, Mother argues that her current home is suitable. As stated above, the Department must prove by clear and convincing evidence that the parent has "demonstrated a lack of concern for the child to

such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date." Tenn. Code Ann. § 36-1-102(1)(A)(ii). As to this portion of the analysis, the court "may consider the parents' more recent behavior." *In re Kayla B.*, No. E2016-01192-COA-R3-PT, 2017 WL 438622, at *7 (Tenn. Ct. App. Feb. 1, 2017) (citing *In re Joshua S.*, No. E2010-01331-COA-R3-PT, 2011 WL 2464720, at *18 (Tenn. Ct. App. June 16, 2011)). Mother presented evidence that, since December 2015, she had been living on Four Winds Lane in a home visited by the guardian ad litem and found by her to be acceptable. Ms. Jennings was aware that Mother was living at this address but had not visited because Mother had not contacted her with the new address. Mother testified that she had called DCS with this information but had been unable to get in touch with Ms. Jennings directly.[6] Mother testified that she had been drug-free for six months and was employed cleaning houses. She planned to have her fines and court costs paid off in two weeks, and then she would be eligible to have her driver's license reinstated.

We conclude that the Department failed to produce clear and convincing evidence that Mother demonstrated lack of concern to such a degree "that it appears unlikely that [she] will be able to provide a suitable home for the child[ren] at any early date." Tenn. Code Ann. § 36-1-102(1)(A)(ii). Therefore, we conclude that the trial court erred in terminating Mother's parental rights based upon the ground of abandonment by failure to provide a suitable home.

## G. Substantial noncompliance

To establish the ground of substantial noncompliance with the permanency plans, the Department must prove by clear and convincing evidence that the parent has not substantially complied with the statement of responsibilities set forth in the permanency plans at issue. Tenn. Code Ann. § 36-1-113(g)(2). Substantial noncompliance "should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548. This court has described the proper analysis for a trial court to use in determining whether a parent has substantially complied with a permanency plan:

> Before analyzing whether the parent complied with the permanency plan, the trial court must find that the permanency plan requirements that the parent allegedly failed to satisfy are "reasonable and related to remedying the conditions which necessitate foster care placement." *In re Valentine*, 79 S.W.3d at 547 (citing Tenn. Code Ann. § 37-2-403(a)(2)(C)).

---

[6] In its questioning of Mother at the hearing, the Department emphasized that she had Ms. Jennings's cell phone number on her cell phone and that Mother could have retrieved her cell phone from the maternal grandmother's house in order to fulfill her responsibility to inform Ms. Jennings of her address. In light of the fact that Ms. Jennings was aware of Mother's address, however, we consider it to be an overreliance on technicalities to refuse to visit Mother's home.

- 16 -

If the permanency plan requirements are reasonable, the court must determine if the parent's noncompliance was substantial; noncompliance is not enough to terminate a parent's rights. *Id.* at 548-49. Additionally, the unsatisfied requirement(s) must be important in the plan's scheme. *Id.* A "trivial, minor, or technical" deviation from the permanency plan's requirements does not qualify as substantial noncompliance. *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004) (citing *In re Valentine*, 79 S.W.3d at 548). Improvements in compliance are construed in favor of the parent. *Id.* at 549 (citing *State Dept. of Human Servs. v. Defriece*, 937 S.W.2d 954, 961 (Tenn. Ct. App. 1996)).

*In re Malaki E.*, No. M2014-01182-COA-R3-PT, 2015 WL 1384652, at *11 (Tenn. Ct. App. Mar. 23, 2015). Whether a parent is substantially noncompliant with a permanency plan is a question of law. *In re Valentine*, 79 S.W.3d at 548.

1. Mother

The Department developed a permanency plan regarding Quintin, Aglacia, and Zavera on May 14, 2014. The permanency goals were to return the children to their parent(s) or for them to exit DCS custody to live with a relative. Mother's action steps under the permanency plan include the following: participate in alcohol and drug assessment, follow all recommendations, and provide DCS with proof of completion; submit to random drug screens; provide documentation to DCS of the resolution of all legal issues and sign releases to allow DCS to exchange information with her probation officer; submit to random pill counts of all prescribed medications; be free from all illegal activity and legal problems; obtain safe, stable housing with working utilities and provide proof of housing to DCS; obtain a legal means of income sufficient to meet the needs of her children and provide proof of income to DCS; provide a transportation plan to DCS; continue to participate in scheduled supervised visits with each child every other Tuesday; participate in mental health evaluation, follow all recommendations, and provide documentation of completion to DCS; complete parenting classes to address appropriate discipline and provide DCS documentation of completion; and notify DCS of any significant changes such as in employment, address, or phone number. This permanency plan was ratified by the juvenile court on July 7, 2014.

The Department developed a second permanency plan in October 2014. This plan was similar to the May 2014 plan, but it added a few more requirements. Mother was to attend all medical appointments to insure the safety of her unborn child and continue working with Health Connect to complete the steps in her permanency plan. This second permanency plan was also ratified by the juvenile court.

In January 2015, DCS developed a new permanency plan to include Christopher IV. This plan included permanency goals of returning the children to their parent(s) and

adoption. The requirements of this plan are substantially similar to those of the previous plans, but in some instances provide specific deadlines. Mother was also required to attend neonatal abstinence syndrome classes and notify DCS of any need for assistance; schedule a parenting assessment, provide DCS with documentation of any recommendations, and notify DCS of any barriers to obtaining documentation of the recommendations; and, if Mother did not have insurance, apply for insurance and provide DCS with a denial letter. She was also required to submit applications for public housing and public assistance, if eligible; apply new parenting skills during visits with the children and show up on time for visits; contact DCS if she encountered barriers to obtaining housing; if unable to locate housing within the required time frame, provide DCS with a list of applications and contact information; and communicate with DCS twice a week.

The trial court found that the requirements of the permanency plans were "reasonably related to the achievement of the goal and reasonably related to remedying the conditions which necessitated foster care." Mother asserts that the plans' requirement that she resolve all legal issues "appears unrelated to the reasons for removal." Our Supreme Court has stated that, under Tenn. Code Ann. § 36-1-113(g)(2), "[c]onditions necessitating foster care placement may include conditions related both to the child's removal and to family reunification." *In re Valentine*, 79 S.W.3d at 547. The requirement that Mother resolve her legal issues is reasonably related to returning her children to her care. We, therefore, consider this requirement to be reasonably related to remedying the conditions that necessitated foster care.

Mother emphasizes that, in considering the ground of substantial noncompliance, "[o]ur focus is on the parent's efforts to comply with the plan, not the achievement of the plan's desired outcomes." *In re Aiden R.*, No. E2015-01799-COA-R3-PT, 2016 WL 3564313, at *9 (Tenn. Ct. App. June 23, 2016). She argues that the trial court erred in focusing on outcomes, rather than on Mother's efforts. In concluding that clear and convincing evidence existed to terminate Mother's parental rights on the ground of substantial noncompliance, the trial court made the following findings:

> The testimony is that mother has failed to complete the required NAS, Neonatal Abstinence Syndrome, parenting class although she did complete a divorcing parent class at some point. However, the Court believes that may have been prior to the last removal and would have certainly been prior to the permanency plans requiring her to have Neonatal Abstinence Syndrome parenting classes, so she has failed to complete that requirement. She has failed to resolve or avoid criminal issues as evidence[d] by the violation of probation and the failure to appear and picking up the theft under $500.00 charge to begin with. She has not enjoyed a long-term sobriety. There is testimony and there are records in evidence indicating that mother has been seen at several rehab facilities. But with respect to at

least some of them she didn't complete them or she was discharged from them or she left against advice. She has not enjoyed long-term sobriety. She has had an alcohol and drug assessment, *but has apparently not followed through on whatever recommendations were made.* She has also, subsequent to the first petition involving the removal for Neonatal Abstinence Syndrome, had two additional children who were positive for substances at the time of their birth.

(Emphasis added).

According to Mother's argument, the trial court improperly focused upon Mother's failure to complete the NAS parenting class. Mother completed a parenting for divorce class in May 2014; she testified that she mistakenly thought this satisfied the permanency plan requirements and that no one from DCS told her that she needed additional parenting classes.[7] Ms. Jennings's affidavit of reasonable efforts dated November 3, 2015 states: "[Mother] has completed parenting classes and provided documentation to the department." With respect to Mother's criminal issues, it is important to note that all of her criminal charges relate to her conviction for theft under $500 in October 2014. All of her probation violations stem from that original conviction. At the time of the hearing, Mother testified that she planned to pay off her court costs and fines in two weeks, thereby ending her probation.

One of the main reasons why Mother's children were removed from her custody in April 2014 was drug exposure. The permanent parenting plans required Mother to "attend and honestly participate in the alcohol and drug assessment" and follow all recommendations, provide DCS with documentation of completion of the assessment and all recommendations, and submit to random drug screens. The record shows the following sequence of events with respect to Mother's drug abuse and treatment:

- May 29, 2014: Refused random drug screen.
- August 1, 2014: Tested positive for buprenorphine, opiates, hydromorphone, opiate derivatives.
- September 17, 2014: Began outpatient treatment for opiate dependency at Watauga, started on subutex. She was pregnant.
- November-December 14, 2014: Completed mental health assessment at Health Connect. Discharged from therapy for lack of attendance.
- December 16, 2014: Birth of Christopher IV, tested positive for drugs.
- December 29-31, 2014: Treatment at Comprehensive Community Services ("CCS"). Quit after two days.

---

[7] Mother further testified that, after the birth of her fifth child (who is not at issue in this case), she and her husband were told that, because the child was taken into custody immediately after birth, it was not necessary for them to take the NAS parenting classes.

- 19 -

- Relapse after birth of Christopher IV and removal by DCS.
- February 23-March 17, 2015:  Treatment at New Hope for opiate dependence.  Discharged due to continued use.  Referred to higher level of care.
- March ?-27, 2015:  Returned to CCS for a few days.
- October 2015-February 2016:  Mother received treatment at Renaissance Center's halfway house until the birth of her baby on February 11, 2016.  (On November 12, 2015, Mother tested positive for buprenorphine and oxycodone.  This occurred during a short period when she left Renaissance.  She was then readmitted.)
- January 11, 2016:  Back to Watauga for one outpatient counseling appointment.
- February 11, 2016:  Birth of Searia.  Tested positive for drugs.
- February 2016-June 2016:  Attended and graduated from Peninsula's intensive outpatient program.  (Afterward, began relapse prevention program.)
- At the hearing, Mother testified that she had been drug-free for six months.

At the hearing, Ms. Jennings testified that Mother had completed an alcohol and drug assessment, but that she herself had to request the documentation because Mother failed to provide it.  The trial court's vague statement that Mother "has apparently not followed through on whatever recommendations were made" does not constitute clear and convincing evidence that she failed to substantially comply with the recommendations.  In fact, we do not find anything in the record detailing the recommendations made in the alcohol and drug assessment.

Viewing the evidence as a whole, and focusing upon Mother's efforts rather than upon the results of those efforts, we conclude that DCS failed to prove by clear and convincing evidence the elements necessary to terminate Mother's parental rights on the ground of substantial noncompliance.  We, therefore, reverse the trial court's termination of Mother's parental rights on this ground.

2.  Shawn H.

The responsibilities of Shawn H. under the May 2014 permanency plan were the same as for Mother except that, as to visitation, he was to contact DCS when he was released from jail so that a visitation schedule could be established.  Under the September 2014 permanency plan, Shawn H. was required to provide DCS with a relapse prevention plan after completing alcohol and drug abuse rehabilitation.  Additional requirements for Shawn H. under the January 2015 permanency plan included complying with scheduled meetings with in-home service providers to assist him with recommendations of mental health and alcohol and drug assessments; and attend Celebrate Recovery to help maintain a sober lifestyle.  He was also required to submit applications for public housing and public assistance, if eligible; apply new parenting skills during visits with the children

and show up on time for visits; contact DCS if he encountered barriers to obtaining housing; if unable to locate housing within the required time frame, provide DCS with a list of applications and contact information; and maintain contact with DCS twice a week.

With respect to Shawn H., the trial court made the following findings on the issue of substantial noncompliance:

> . . . He was to have an alcohol and drug assessment and follow the recommendations, to have suitable income, have a suitable home, have his criminal issues resolved, have a transportation plan, a mental health assessment, all of the things mentioned [in the permanency plan].

> [Shawn H.] did have an alcohol and drug assessment but did not complete the follow-up and then suffered a relapse apparently.[8] He has had ongoing criminal issues and is currently serving an eight-year sentence. He has no income, no appropriate home or transportation at this time. He did complete some parenting classes.

Ms. Jennings testified that Shawn H. contacted her once or twice a week when he was not incarcerated. She opined that he "would be a great parent to his children had it not been for his inability to handle his alcohol and drug issues." Ms. Jennings stated that Shawn H. came to visits with the children two or three times in a state of visible intoxication.

The main argument made by Shawn H. on appeal is that the Department failed to make reasonable efforts to help him complete the permanency plans. In the case of *In Re Kaliyah S.*, 455 S.W.3d 533, 535 (Tenn. 2015), our Supreme Court held that, pursuant to Tenn. Code Ann. § 36-1-113, "the State need not prove that it made reasonable efforts as an essential component of its petition to terminate parental rights." This court has specifically applied this holding to the ground of substantial noncompliance. *See, e.g., In re Jasmine B.*, No. M2016-00464-COA-R3-PT, 2016 WL 5345339, at *4-5 (Tenn. Ct. App. Sept. 22, 2016); *In re Faith W.*, No. M2014-01223-COA-R3-PT, 2015 WL 2438297, at *2-3 (Tenn. Ct. App. May 20, 2015); *In re J.A.G.*, No. M2014-01469-COA-R3-PT, 2015 WL 1022281, at *3-4 (Tenn. Ct. App. Feb. 27, 2015).

We conclude that the facts, as found by the trial court, clearly and convincingly establish the elements necessary to terminate Shawn H.'s parental rights on the ground of substantial noncompliance with the permanency plans.

---

[8] "Apparently" is not a finding of a relapse by clear and convincing evidence. Words matter.

- 21 -

3. Christopher III

The January 2015 permanency plan (the only plan related to Christopher III's parental rights to Christopher IV) included the following action steps: submit to random pill counts of prescribed medications; notify DCS of any new charges against him; schedule an alcohol and drug assessment by February 13, 2015 and notify the Department of the time and place of the assessment; submit to and pass random drug screens; provide documentation to DCS of the resolution of all legal issues and the contact information for his probation officer; provide a lease agreement to DCS by February 13, 2015 and maintain safe, stable housing; notify the Department of changes in employment, address, phone number, etc.; have a legal means of income and provide proof to DCS; attend scheduled visitation on time; submit a transportation plan to DCS; contact DCS at least once a week; schedule a parenting assessment by February 6, 2015, inform DCS of the time and location, and provide DCS with documentation of any recommendations; participate in a mental health evaluation, follow all recommendations, and provide DCS with documentation of completion; if he did not have insurance, apply for insurance and provide DCS with a denial letter; and attend neonatal abstinence syndrome classes and notify DCS of any need for assistance. Christopher III was also required to submit applications for public housing and public assistance, if eligible; apply new parenting skills during visits with the children and show up on time for visits; contact DCS if he encountered barriers to obtaining housing; and, if unable to locate housing within the required time frame, provide DCS with a list of applications and contact information.

Christopher III argues that the trial court erred in terminating his rights to Christopher IV on the ground of substantial noncompliance because the Department failed to prove by clear and convincing evidence (1) that the requirements of the permanency plan were reasonably related to the conditions that necessitated foster placement, and (2) that Christopher III failed to substantially comply with the requirements of the permanency plan.

In responding to Christopher III's first argument, the Department contends that permanency plan requirements may be related "both to the child's removal and to family reunification." *In re Valentine*, 79 S.W.3d at 547. The termination petition seeks to terminate Christopher III's parental rights with respect to Christopher IV, the only one of Mother's children for whom he is the biological father. Christopher III's involvement with this case started before Christopher IV's birth, however. He was part of Mother's life when the Department took custody of the three older children and, therefore, was a participant in the permanency plans developed in May and September 2014.

After Christopher IV was born in December 2014, the Department filed a petition to remove him from his parents' custody while he was still in the hospital. The basis for the petition was Christopher IV's drug exposure at birth and his parents' history of drug abuse. The new permanency plan developed in January 2015 included all of the

requirements from the previous plans and also required Christopher III to attend neonatal abstinence syndrome classes. As the Supreme Court stated in *In re Valentine*, 79 S.W.3d at 547, "[c]onditions necessitating foster care placement may include conditions related both to the child's removal and to family reunification." The tasks included in Christopher III's permanency plans are reasonably related to the conditions that led to the removal of Christopher IV and to Christopher III's reunification with his son.

Clear and convincing evidence shows that Christopher III failed to substantially comply with the requirements of the permanency plans. Most significantly, he visited Christopher IV only three times, once in the hospital and twice in April 2015. Christopher III admits that he lost his house and relapsed on drugs after Christopher IV was removed from the parents' custody. He failed a drug screen in January 2015. Christopher III failed to complete a mental health assessment and failed to show that he followed any of the recommendations of the alcohol and drug assessment he completed. He was incarcerated for several days in June 2015 on a previous theft charge, from October 2015 to May 2016 on another theft charge, and from July 2016 through the trial on a probation violation. Christopher III never provided proof of completion of a class on neonatal abstinence syndrome.

The facts, as found by the trial court, clearly and convincingly establish the elements necessary to terminate Christopher III's parental rights on the ground of substantial noncompliance with the permanency plans.

## H. Persistence of conditions

In its petition to terminate parental rights, DCS alleged the ground of persistent conditions with respect to Mother and Christopher III. The Department concedes this ground as to Mother's and Christopher III's rights to Christopher IV because the record does not contain a final dependency and neglect order with respect to Christopher IV. *See In re Audrey S.*, 182 S.W.3d at 874 (holding that the ground of persistence of conditions only applies "where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse"). We agree that the ground of persistence of conditions has not been proven by clear and convincing evidence with respect to Christopher IV and, therefore, we reverse the trial court's termination of Mother's and Christopher III's parental rights to Christopher IV on this ground.

We now proceed to address whether the trial court erred in terminating Mother's parental rights to the oldest three children on the grounds of persistence of conditions. Tennessee Code Annotated section 36-1-113(g)(3) authorizes termination of parental rights when:

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

As this court has previously stated, the goal of the ground of persistence of conditions "is to avoid having a child in foster care for a time longer than reasonable for the parent to demonstrate her ability to provide a safe and caring environment for the child." *In re Malaki E.*, 2015 WL 1384652, at *9 (citing *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), *overruled on other grounds*, *In re Kaliyah S.*, 455 S.W.3d at 555 n.34). The persistence of conditions ground focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *In re Audrey S.*, 182 S.W.3d at 874. The court must determine "the likelihood that the child can be safely returned to the custody of the mother, not whether the child can safely remain in foster care . . . ." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000). "A parent's continued inability to provide fundamental care to a child, even if not willful, whether caused by a mental illness, mental impairment, or some other cause, constitutes a condition which prevents the safe return of the child to the parent's care." *In re Jamazin H.M.*, No. W2013-01986-COA-R3-PT, 2014 WL 2442548, at *6 (Tenn. Ct. App. May 28, 2014).

In this case, Quintin, Aglacia, and Zavera first entered DCS custody in April 2014 and were determined to be dependent and neglected due to drug exposure and environmental neglect. Mother was convicted of theft under $500 in September or October 2014. Christopher IV was born drug-exposed in December 2014. Mother became homeless and returned to heavy drug use after Christopher IV was removed from her custody. She was in and out of treatment programs. In May 2015, Mother was incarcerated on a probation violation. When the petition to terminate Mother's parental rights was filed in July 2015, her problems with drug use and unstable housing were ongoing.

Mother testified at the hearing that she had been drug-free for six months and that she had obtained stable housing. The Department points out that Mother failed to notify her caseworker of her new address or to provide documentation of completion of alcohol and drug treatment. Two weeks before the trial, Mother was incarcerated for ten days for violating probation and failing to appear. While we commend Mother for her efforts to improve the conditions preventing the return of the children to her custody, we agree with the trial court that there is clear and convincing evidence to establish that some of these conditions persist and that there is "no evidence that those conditions will be remedied soon so that the children could be returned safely to the home." Mother's improvements in the months immediately preceding the hearing are "too little too late" in light of her long history of unstable housing and drug use as well as her criminal charges and incarcerations. *See In re A.M.T.*, No. M2003-02926-COA-R3-PT, 2004 WL 1488573, at *9 (Tenn. Ct. App. July 2, 2004) (including discussion of last minute efforts in the context of persistent conditions).

Moreover, continuation of Mother's relationship with the children "greatly diminishes the child[ren]'s chances of early integration into a safe, stable and permanent home." Tenn. Code Ann. § 36-1-113(g)(3)(C). The children have been with the foster parents since December 2014 and, according to their therapist, the children and the foster parents have a caring and loving relationship. The therapist opined that it would be "the biggest mistake in the world" to remove the children from the foster home. The foster parents wish to adopt the children if possible.

## I.   Severe child abuse

The petition to terminate parental rights alleges: (1) that Mother and Shawn H. committed severe child abuse against Zavera, and (2) that Mother and Christopher III committed severe child abuse against Christopher IV. The trial court denied the ground of severe child abuse as to both Mother and Christopher III and made no ruling on this ground with respect to Shawn H. On appeal, the Department argues that the trial court erred in failing to terminate Mother's parental rights on the ground of severe child abuse.

Tennessee Code Annotated section 36-1-113(g)(4) establishes a ground for parental termination under the following circumstances:

> The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian[.]

The definition of "severe child abuse" in Tenn. Code Ann. § 37-1-102(b)(21) (2015)[9] provided, in pertinent part:

> (A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;
> (ii) "Serious bodily injury" shall have the same meaning given in § 39-15-402(d).[10]
> (B) Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct[.]

1. Mother

In denying this ground as to Mother, the trial court ruled as follows:

> The basis again is going back to the initial removal. There is no allegation of severe child abuse, and in fact, DCS advocated for the return of that child to mother. A prior Court has found no severe abuse at the Preliminary Hearing state as to [Christopher III]. Moreover, having reviewed the testimony of Dr. Weinstein; the standard under 37-1-102: knowing exposure or failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death or specific abuse or neglect towards a child that in the opinion of an expert has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay, or intellectual disability or severe impairment of the child's ability to function adequately in the child's environment.
> Having read Dr. Weinstein's deposition testimony, it seems clear that her opinion is that the children who were born with Neonatal

---

[9] We reference the version of the statute in effect at the time the petition to terminate parental rights was filed. This section has since been amended.

[10] Tennessee Code Annotated section 39-15-402(d) (2015) defined "[s]erious bodily injury to the child" as including, but not limited to, "second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects."

[A]bstinence Syndrome were placed in an increased risk.  But the Court does not find that her testimony establishes that they are reasonably likely to suffer or do suffer from some of the things associated with the increased risk.  So for that reason, as to mother, the severe child abuse is not found.

We respectfully disagree with the trial court's reasoning.  As the Department points out, Tenn. Code Ann. § 36-1-113(g)(4) does not require a finding of severe abuse by a previous court; it specifically provides that the "court hearing the petition to terminate parental rights" may make a finding of severe child abuse.  Moreover, the Court of Appeals has previously found severe child abuse based upon a child's exposure to drugs in utero and withdrawal symptoms at birth, including problems with feeding and sleep.  *See Cornelius v. State Dep't of Children's Servs.*, 314 S.W.3d 902, 908, 910-11 (Tenn. Ct. App. 2009).  The court noted that a child's later healthy development "'does not diminish the severity of the harm to which the child was exposed.'"  *Id.* at 910 (quoting *In re M.J.J.*, No. M2004-02759-COA-R3-PT, 2005 WL 873305, at *8 (Tenn. Ct. App. Apr. 14, 2005)).

The evidence in the record establishes that Mother used illegal drugs during her pregnancies with Zavera and Christopher IV, and that both children were born exposed to drugs.  When Zavera was born, her meconium[11] tested positive for opiates and cannabinoids.  She was diagnosed with narcotic abstinence syndrome and took medicine (phenobarbital) to decrease the symptoms of drug withdrawal.  While in the hospital, Zavera exhibited symptoms of loose stools, increased muscle tone, excessive crying and sucking, poor feeding, tremors, and little sleep.  She remained in the hospital for over a week after birth.  When Christopher IV was born, his cord blood tested positive for buprenorphine and meperidine, and his score on the Finnegan Neonatal Abstinence Scoring System reached twelve.[12]  He was diagnosed with narcotic abstinence syndrome and given medication to treat his withdrawal symptoms.

Dr. Miriam Weinstein, a specialist in pediatric rehabilitation and developmental pediatrics, testified about the dangers to a child, like Zavera, whose mother uses oxymorphone during pregnancy:

Well, there's dangers in terms of how well the brain develops.  The pathways especially for sensory processing can be impaired.  The pathways for things like higher-order level emotional control, which are not so

---

[11] Meconium is "a dark greenish mass that accumulates in the bowel during fetal life and is discharged shortly after birth." https://www.merriam-webster.com/dictionary/meconium.

[12] The Finnegan Neonatal Abstinence Scoring System is a scale designed to measure the severity of NAS and to provide guidance for treatment.  For a score of eight or greater, pharmacologic therapy is recommended.  Lauren M. Jansson, Martha Velez & Cheryl Harrow, *The Opioid Exposed Newborn: Assessment and Pharmacologic Management*, 5(1) J OPIOID MANAG. 47-55 (2009).

apparent when a child is an infant, may also assume problems and be impaired.

Dr. Weinstein testified that suboxone and subutex are safer than street drugs if taken with a prescription. She opined that using a variety of drugs and switching back and forth "is not good for the developing brain because each one tends to hit the circuits a little differently and cumulatively."

Dr. Weinstein expressed concern about Mother's polysubstance abuse during her pregnancy with Zavera and the ultrasound results showing growth retardation of the baby. Head circumference on the ultrasound was in the tenth percentile. Based upon Zavera's Finnegan scores (as high as ten on phenobarbital and diluted tincture of opium), Dr. Weinstein described the pain the baby was experiencing as follows:

> The child is experiencing pretty much the same sort of things that an adult experiences with withdrawal. They have—They can have an increase in blood pressure, an increase in muscle tone, increase in discomfort, be so upset that they cry nonstop and can't be comforted. You can't have a long discussion with them. But if you listen to them, you realize that they are very, very uncomfortable.

She further testified that, without the proper medication management, such a baby can have a seizure, which could cause death. According to Dr. Weinstein, children with narcotic abstinence syndrome are "at increased risks for a lot of developmental issues, including just sensory processing of helping them to become comfortable in their own skins." She stated that these children "are more at risk for developmental delays; walking, talking, and so on."

With respect to the medical records on Christopher IV, Dr. Weinstein noted with concern Mother's tendency to start and stop taking subutex, which causes withdrawal symptoms for the unborn baby. During his hospitalization, Christopher IV was started on diluted tincture of opium to treat his withdrawal symptoms.

Asked specifically about the risks to which these two children were exposed, Dr. Weinstein responded, as to Zavera:

> The most severe is fetal demise, intrauterine growth retardation, poor brain development. She was at risk for long-term issues with neuromotor development, sensory processing disorders so that she would be having problems with ordinary sensations like sounds, touch, motion, and so on. Feeding problems, both when she was having withdrawal and, also, when she was being transitioned from, say, the bottle to regular food because of sensory issues. Babies who have had this exposure can have problems with

adjusting to table foods and have feeding issues because of that. Learning disabilities, behavioral issues, increased risks for psychosocial issues in adolescence and young adulthood. So, there's quite a long list.

Dr. Weinstein then opined that these same risks applied equally to Christopher IV.

As noted above, children's exposure to drugs and withdrawal symptoms at birth alone can be sufficient to constitute severe abuse. *See Cornelius*, 314 S.W.3d at 909-11. Moreover, contrary to the trial court's conclusion, the evidence in the record establishes that Zavera and Christopher IV suffer from some of the problems for which their exposure to drugs at birth put them at risk, as described by Dr. Weinstein in her testimony.

At the time of the hearing, Zavera was almost four years old. The foster mother testified that Zavera only slept two to three hours a night; she was being treated at a sleep center. She exhibited developmental delays on testing and was in a developmental pre-kindergarten program that provided services for her developmental delays as well as speech therapy. Zavera was also receiving behavioral therapy for aggression impulsivity. The foster mother testified that Zavera had pica,[13] which caused her to eat things such as trash and puzzle pieces. Furthermore, Zavera had no fear of strangers and no comprehension of cause and effect. According to the foster mother, Zavera "would literally do something that could hurt her" and "if you explain to her the consequences of that, she would go back and do it again."

Christopher IV was not yet two years old at the time of the hearing. He was under the care of a specialist in narcotic abstinence syndrome who evaluated his progress. Christopher IV had "a sensory issue with feeding" involving his gag reflex; he did not eat solid food and was not gaining weight appropriately. He ate PediaSure and was in feeding therapy, but the foster mother testified that he was "not doing well" with the feeding therapy, in which he was to be weaned off of Pediasure. He could not eat even baby food.

In light of this evidence, we conclude that there is clear and convincing evidence that Mother exposed Zavera and Christopher IV to severe child abuse, most particularly to "abuse or neglect . . . that in the opinion of qualified experts has caused or will reasonably be expected to produce . . . severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment." Tenn. Code Ann. § 36-1-102(b)(21)(B) (2015). Therefore, the trial court erred in failing to terminate Mother's parental rights on the ground of severe child abuse.

---

[13] Pica is "an abnormal desire to eat substances (such as chalk or ashes) not normally eaten." https://www.merriam-webster.com/dictionary/pica.

## 2. Christopher III

The Department does not argue against the trial court's denial of the severe child abuse ground as to Christopher III. There is evidence in the record to show that Father attempted to help Mother to stay off of illegal drugs during her pregnancy with Christopher III. The trial court found that "this Court would not find any evidence of severe abuse in the record as to [Christopher III]." We agree with the trial court's conclusion that this ground was not established as to Christopher III by clear and convincing evidence.

## II.  Best Interest

Having found clear and convincing evidence exists for at least one ground to terminate the parental rights of Mother, Shawn H., and Christopher III, we next consider whether the trial court properly determined that termination of each parent's rights is in the children's best interest. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003) (noting that the trial court is only required to find one statutory ground for terminating a parent's rights). In reviewing the trial court's best interest determination, we are mindful that, "Facts relevant to a child's best interests need only be established by a preponderance of the evidence, although DCS must establish that the combined weight of the proven facts amounts to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 535 (citing *In re Kaliyah*, 455 S.W.3d at 555).

The factors a trial court is to consider in determining whether terminating a parent's rights to his or her children is in the children's best interest are set forth in Tenn. Code Ann. § 36-1-113(i) and include the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or

psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

The best interest analysis "does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors"; rather, the relevance and weight accorded to each factor depends upon the facts of each case. *In re Audrey S.*, 182 S.W.3d at 878. Moreover, the list of factors in Tenn. Code Ann. § 36-1-113(i) is not exhaustive, and the court may consider any other relevant factors. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005); *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004).

The trial court made the following findings regarding the best interest of the children in this case:

> The court does find, based upon all of the testimony and the evidence in this case, that the parents have not made adjustments of circumstances or conduct to make it safe or in the Best Interest of these children to be returned to their custody. Specifically, both fathers are currently in jail, in custody for criminal offenses. No one seems to have a stable housing situation. Mother has been in jail but is out now. Mother has continued to struggle with substance abuse. She has presented for treatment at places, but there is nothing in the record to suggest that she has had any long term sobriety. The Court finds that they have not made any lasting adjustment and the Court does find that reasonable efforts were made by the Department of Children's Services to help them to work their Permanency Plan and to make lasting adjustments so that custody could be returned.
>
> The parents have not maintained regular visitation or contact with the children. The court has outlined the relevant time period where [Mother and Christopher III] had two visits and [Shawn H.] had one visit. The Court determines that to be token visitation. None of them have apparently visited with the children in quite some time. The Court finds that there is not a meaningful relationship that has been established between the parents

and the children. Moreover, very importantly, there has been testimony from a qualified expert that changing caretakers or change in physical custody of the children is likely to have a negative impact.

The Court also finds that foster parents have had the children in therapy. They have had the children in extracurricular activities. The [foster] mother is a stay-at-home mother. They seem to be well bonded with the children. The children, according to testimony, refer to the foster parents as "mom and dad." The Court does find that changing caretakers or physical custody is likely to have a negative impact upon the children at this point.

The physical environment of the parents, if custody were returned to them, could include criminal activity or use of illegal or illicit drugs; based upon the rather extensive history of criminal activity and drug use that has been established in this case.

There has also been a lack of support financially by the parents, as previously mentioned and addressed.

Lastly, with respect to the mental and emotional status of the parents, particularly if they are still having issues with drug abuse or drug dependence, the Court finds that could be detrimental to having the children placed with them.

For these reasons, the trial court concluded that it was in the best interest of all four children for the parental rights of Mother, Shawn H., and Christopher III to be terminated.

In arguing that terminating her parental rights is not in the best interest of the children, Mother emphasizes her improvement in the months before the hearing, when she testified that she had been drug-free for six months, was living in a fully-furnished four-bedroom home, and was employed cleaning houses. Despite Mother's commendable efforts, the evidence does not preponderate against the trial court's finding that "there is nothing in the record to suggest that [Mother] has had any long term sobriety." Mother complains that DCS failed to make reasonable efforts to assist her, but she herself failed to maintain contact with the Department, thereby hampering its efforts to help her.

Shawn H. emphasizes the statement of Ms. Jennings that he would be a great parent if not for his substance abuse issues. He points out that he is presently drug-free, but he is also incarcerated on an eight-year sentence. Christopher III points out that he was employed and paid child support when he was not incarcerated. Unfortunately, at the time of trial, he was incarcerated and had pending drug charges. Moreover, he only visited his son a few times when he was not incarcerated.

We agree with the trial court that there is clear and convincing evidence that termination of the parental rights of Mother, Shawn H., and Christopher III is in the best interest of the children.

For the foregoing reasons, we affirm the trial court's termination of Mother's parental rights on the grounds of abandonment by failure to visit in the four months prior to incarceration (Tenn. Code Ann. § 36-1-102(1)(A)(iv)); abandonment by wanton disregard (Tenn. Code Ann. § 36-1-102(1)(A)(iv)); and persistence of conditions as to the oldest three children (Tenn. Code Ann. § 36-1-113(g)(3)).  We reverse the trial court's denial of the ground of severe child abuse (Tenn. Code Ann. § 36-1-113(g)(4)) and find that there is clear and convincing evidence to support this ground for termination of Mother's parental rights as to Zavera and Christopher III.  We further reverse the trial court's decision with respect to the following grounds for termination of Mother's rights as we have concluded that there is not clear and convincing evidence to support these grounds:  abandonment by failure to visit or support during the four months prior to the filing of the petition (Tenn. Code Ann. § 36-1-102(1)(A)(i)); abandonment by failure to support during the four months prior to incarceration (Tenn. Code Ann. § 36-1-102(1)(A)(iv)); abandonment by failure to provide a suitable home (Tenn. Code Ann. § 36-1-102(1)(A)(ii)); substantial noncompliance (Tenn. Code Ann. § 36-1-113(g)(2)); and persistence of conditions with respect to Christopher IV (Tenn. Code Ann. § 36-1-113(g)(3)).

As to Shawn H., we affirm the decision of the trial court with respect to the grounds of abandonment by failure to visit during the four months prior to the filing of the petition (Tenn. Code Ann. § 36-1-102(1)(A)(i)); and substantial noncompliance (Tenn. Code Ann. § 36-1-113(g)(2)).  We reverse as to the ground of abandonment by failure to support during the four months prior to the filing of the petition (Tenn. Code Ann. § 36-1-102(1)(A)(i)).

We affirm the trial court's decision to terminate Christopher III's parental rights on the grounds of abandonment by failure to visit during the four-month period prior to incarceration (Tenn. Code Ann. § 36-1-102(1)(A)(iv)); abandonment by wanton disregard (Tenn. Code Ann. § 36-1-102(1)(A)(iv)); and substantial noncompliance (Tenn. Code Ann. § 36-1-113(g)(2)).  We further affirm the trial court's denial of termination of Christopher III's parental rights on the grounds of abandonment by failure to support prior to incarceration (Tenn. Code Ann. § 36-1-102(1)(A)(iv)), or prior to the filing of the petition (Tenn. Code Ann. § 36-1-102(1)(A)(i)); and severe child abuse (Tenn. Code Ann. § 36-1-113(g)(4)).  We reverse as to the following grounds with respect to Christopher III:  abandonment by failure to visit during the four months prior to the filing of the petition (Tenn. Code Ann. § 36-1-102(1)(A)(i)); abandonment by failure to provide a suitable home (Tenn. Code Ann. § 36-1-102(1)(A)(ii)); and persistent conditions (Tenn. Code Ann. § 36-1-113(g)(3)).

CONCLUSION

As stated above, we affirm in part and reverse in part the decision of the trial court with respect to the grounds upon which termination is granted as to each parent. We affirm the trial court's decision regarding the best interest of the children. The judgment of the trial court terminating the parental rights of each of the defendants is affirmed. This matter is remanded with costs of appeal assessed against the Department of Children's Services, and execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE